Maria VELASQUEZ, Isaiah Moreland, Amelia Aguirre, Ben Aguirre, and John McCowan, Individually and on behalf of all Black and Mexican-American Citizens of the City of Abilene, Texas, Plaintiffs-Appellants,

v.

The CITY OF ABILENE, TEXAS, E. Hall, B. Proctor, K. Webster, L.D. Hilton, J. Bridges, A.E. Fogle, Jr., and J. Rodriguez, the Mayor and City Councilmen of the City of Abilene, Texas, all in their official capacities, Defendants-Appellees.

No. 82–1630.

United States Court of Appeals, Fifth Circuit.

March 2, 1984.

Rehearing Denied March 29, 1984.

---

William L. Garrett, Dallas, Tex., Gale Patterson, Fort Worth, Tex., for plaintiffs-appellants.

Harvey Cargill, Jr., City Atty., Gary Landers, John T. Patterson, Karen L. Anderson, Asst. City Attys., Abilene, Tex., for defendants-appellees.

Before GARZA, WILLIAMS and HIGGINBOTHAM, Circuit Judges.

GARZA, Circuit Judge:

We have before us an appeal by plaintiffs-appellants (Blacks and Mexican-Americans) from the denial of their petition for declaratory judgment and other relief alleging that the at-large election system for selection of Abilene City Council members violates the Fourteenth and Fifteenth Amendments, as well as 42 U.S.C. §§ 1971, 1973, 1983 and 1988. The trial was to the court, which made extensive findings in a memorandum opinion. The City of Abilene cross-appeals from the denial of its motion for attorneys fees.

Abilene was organized as a city in 1885. From 1890 to 1892 aldermen were elected at-large. In 1893 and 1894, at the same time that the Populist Party appeared in Taylor County challenging the democrats, ward elections were held. After the Texas Attorney General ruled that ward elections were unconstitutional and a Texas court agreed, and after the Texas legislature had passed an act requiring city-wide elections, Abilene reverted to at-large elections. The city adopted a home rule charter in 1911, continuing the at-large election system. In 1962 Abilene adopted its present charter, continuing an at-large election scheme and also adding a majority vote requirement.

Under the present at-large system there are six (6) councilmen and a mayor. The councilmen each run for a specific seat and must win by a majority vote. Elections are staggered, with two (2) councilmen elected each year and the mayor every third year. Three councilmen must live on the north side of the city, three on the south side, and the mayor may reside anywhere within the city.

Blacks make up 6.7 percent of the population of Abilene and Mexican-Americans constitute 12.6 percent. Both groups are concentrated in one area. Under the plaintiffs' proposed election system, minorities would constitute 48.3 percent of the population of one district. One Black and two Mexican-Americans have been elected to the council since 1973. All three were sponsored by the Citizens for Better Government, a white-anglo dominated slating organization which exercises nearly complete control over Abilene City politics through its endorsement and support of candidates. The Citizens for Better Government, CBG hereafter, has had a success rate of 92.5 percent since 1966 and 100 percent since 1974. The record shows that no independent Black or Mexican-American has ever been elected, although several have run unsuccessfully.

The minority voters have alleged that the at-large system of elections unconstitutionally dilutes their voting strength. Such dilution is said to be caused by their lack of access to the political system, the lack of responsiveness of the city to their particularized needs, the state policy favoring multi-member districts, and the continuing effects of general and official racial discrimination. They also allege that the structural devices of large voting districts lacking a minority vote and an anti-single shot voting requirement, and a modified district residency voting requirement, enhance the opportunity for their votes to be diluted.

Appellants also allege that while it is true that one Black and two Mexican-Americans have been elected to the council since 1973, all three were sponsored by CBG and those elected were mere tokens put forward by a slating organization in which minorities have no real influence under the current system.

The court below concluded that there was no invidious purpose behind the adoption of the at-large election scheme at any of the dates of its adoption. The trial court examined the evidence according to the *Zimmer* factors, *Zimmer v. McKeithen,* 485 F.2d 1297 (5th Cir.1973), *aff'd on other grounds sub nom., East Carroll Parish School Bd. v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976), to determine if there was sufficient circumstantial evidence to demonstrate an invidious purpose behind the maintenance of the system. It concluded there was no such invidious purpose. Finally, the court found that although the Voting Rights Act amendments of 1982, 42 U.S.C.A. § 1973 (West Supp.1983), abolished any necessity to prove a discriminato-

ry purpose in order to establish a violation, the at-large election scheme in Abilene did not have a discriminatory effect.

Appellants' principal attacks on the judgment of dismissal by the court below are: (1) that the trial court improperly decided the case upon constitutional grounds when it could have decided the same on statutory grounds alone; (2) that the trial court failed to make detailed findings of fact in its resolution of the minority voters' Voting Rights Act claim, as required by Rule 52(a) F.R.C.P.; and (3) that the trial court did not use the correct standard of proof to decide that there was no violation of the Voting Rights Act.

■■■ Plaintiffs-appellants' argument that the trial court improperly decided the case upon constitutional grounds is unmeritorious for a variety of reasons. First, plaintiffs have not shown that the trial court could properly have decided the case on statutory grounds alone. Second, plaintiffs' complaint included allegations of constitutional violations as well as statutory violations; plaintiffs cannot now be heard to complain that the trial judge addressed those allegations. Finally, in voting dilution cases many of the questions asked to determine whether there has been a statutory violation are also asked when a constitutional violation claim is evaluated. We see no reason why in voting dilution cases, in light of the interrelated standards, a trial court cannot consider both the constitutional and statutory claims together. Plaintiffs-appellants' first attack on the judgment below must therefore be rejected.

■■■ After reading the record we find merit in plaintiffs-appellants' charge that the trial court failed to make detailed findings of fact in its resolution of their claim that the Voting Rights Act, as amended in 1982, was violated.

Although the trial court is not required to recount and discuss every bit of evidence offered to it, it is required to discuss all the substantial evidence contrary to its opinion. The trial court offered a fairly thorough analysis, but did not discuss all the *substan-*

*tial* contrary evidence. In *Cross v. Baxter,* 604 F.2d 875 (5th Cir.1979), *vacated on other grounds,* 704 F.2d 143 (5th Cir.1983), this circuit discussed the need for detailed findings of fact in voting dilution cases:

> F.R.C.P. 52(a) requires the district court to make findings of fact and conclusions of law in deciding all cases tried without a jury, and these must be sufficiently detailed that the court of appeals can ascertain the factual and legal basis for the district court's ultimate conclusion. Because the resolution of a voting dilution claim requires close analysis of unusually complex factual patterns, and because the decision of such a case has the potential for serious interference with state functions, we have strictly adhered to the rule 52(a) requirements in voting dilution cases and have required district courts to explain with particularity their reasoning and the subsidiary factual conclusions underlying their reasoning. '[C]onclusory findings as to each of the *Zimmer* criteria are no more helpful than an overall conclusory finding of dilution. The factual predicates for such conclusions must be clearly stated by the trial court.' Perhaps in no other area of the law is as much specificity in reasoning and fact finding required, as shown by our frequent remands of voting dilution cases to district courts. As a general rule, if the district court reaches a conclusion on one of the *Zimmer* inquiries without discussing substantial relevant contrary evidence, the requirements of rule 52 have not been met and a remand may be called for if the court's conclusions on the other *Zimmer* inquiries are not sufficient to support a judgment.

*Id.* at 879 (citations omitted).

A close reading of the briefs submitted by the parties indicates that none of the law on any issue in this case is in real controversy. Both the constitutional and statutory claims of the plaintiffs below involve extraordinary fact-oriented issues. The district court's factual findings in voting dilution cases represent "a blend of history and an intensely local appraisal of the design and impact of the . . . multi-

member district in the light of past and present reality, political and otherwise." *White v. Regester,* 412 U.S. 755, 769–70, 93 S.Ct. 2332, 2341, 37 L.Ed.2d 314 (1973). The Supreme Court has squarely held that the finding of intentional discrimination necessary in voting dilution cases under the Fourteenth Amendment, and by implication under the Fifteenth Amendment, is factual, governed by Rule 52's clearly erroneous standard. *Rogers v. Lodge,* 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982). We have no doubt that the finding of discriminatory effect or result under the Voting Rights Act amendments of 1982 is also governed by the clearly erroneous standard, and while appellants try to argue that dilution cases involve a mixed question of law and fact not governed by the clearly erroneous standard, we cannot embrace this argument. The clearly erroneous standard is applicable in both constitutional and statutory voting dilution cases.

The opinion of the court below is long and detailed and at first blush seems fairly invulnerable to a Rule 52(a) attack. However, because of its failure to take note of substantial contrary evidence presented by the appellants, it is necessary to remand the case for further findings. It may be that the court below did not consider such evidence substantial or did not credit its validity, but we are unable to determine from a silent record the thought processes of the court below.

■ In passing the 1982 amendment to the Voting Rights Act, Congress reacted to the Supreme Court's decision in *City of Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), which had held that a claim of dilution of minority voting strength could succeed only upon a showing of discriminatory purpose. By passing the 1982 amendment, Congress rejected the purpose standard in voting dilution claims and substituted in its place a results test under the totality of the circumstances. As stated in the Senate Report on the amendments:

> The amendment to the language of Section 2 is designed to make clear that plaintiffs need not prove a discriminatory purpose in the adoption or maintenance of the challenged system of [sic] practice in order to establish a violation. Plaintiffs must either prove such intent, or, alternatively, must show that the challenged system or practice, in the context of all the circumstances in the jurisdiction in question, results in minorities being denied equal access to the political process.

S.Rep. No. 417, 97th Cong., 2d Sess., *reprinted in* 1982 U.S.Code Cong. & Ad.News 177, 205. It is clear that Congress intended to lighten the burden of plaintiffs in voting dilution cases.

We are being asked to write on a clean slate under this standard. If under the intentional discriminatory purpose standard we required detailed findings of all relevant substantial evidence, we certainly should require no less under the results test when deciding whether there has been a Voting Rights Act violation.

The court below held that the decision of the citizens of Abilene "to perpetuate the at-large scheme, as provided in the 1911 and 1962 city charters, was a conscientious decision made on the basis of available data and reflective of the pervasive political theory of the time." (Memorandum Opinion at 27). With regards to the 1962 adoption of the at-large election scheme, plaintiffs argue with some merit that more should have been said about this event, which not only continued the at-large election scheme but also added a majority vote requirement.

■ A fact completely ignored by the court below was the plaintiffs' evidence about the extreme level of racial tension during the time period of the 1962 charter amendments, as well as evidence that it was well known at the time that at-large elections, majority vote requirements, and staggered terms tended to dilute minority voting power. There was also evidence presented that the chairman of the Charter Commission, during the 1962 charter election, stated that one of the reasons for the adoption of the majority vote requirement was to insure a minority could not gain

control of the city government. Record, vol. 6 at 605. Defendants contend, however, that this statement in context referred only to a minority in the abstract political theory sense rather than in a racial sense. The court below, however, failed to discuss this evidence in any of its findings. While the district court may be correct in its finding that the city in 1962 adopted at-large elections only for reasons having to do with political theory, we think a more detailed discussion of its 1962 adoption of the at-large system would have been wise. Certainly the addition of the majority vote requirement indicates that the city did not unthinkingly continue its old at-large system. We are all aware that in 1962 there was much racial tension and that a racially discriminatory purpose may well have coexisted with political theory in the adoption of the at-large system at that time. Racial discrimination need only be one purpose, and not even a primary purpose, of an official act in order for a violation of the Fourteenth and the Fifteenth Amendments to occur. *See Arlington Heights v. Metropolitan Housing Corp.,* 429 U.S. 252 at 265, 97 S.Ct. 555 at 563, 50 L.Ed.2d 450 (1977). We see no reason why under the amended Voting Rights Act of 1982 this would not be even more so.

The most important of plaintiffs-appellants' argument is that the court erred in its treatment of whether minorities have equal access to the political process, and in particular the slating process. The CBG, as stated, effectively controls Abilene politics, and it follows that this access factor is the key in an analysis of vote dilution in Abilene. Although the trial court found that the CBG was "white-dominated," the court found minorities had ample opportunities to participate in the CBG. The court below

held that there were no structural barriers to participation and pointed to the support of three minority candidates by the CBG that were elected to the Abilene City Council. Plaintiffs argue that the court below neglected to discuss evidence that presented structural barriers. Although there was evidence that anyone can attend and vote at CBG's meetings, and that there is a nominating committee which at one time had a minority member, there was evidence that this nominating committee only makes recommendations, which can be rejected by the executive committee. In the Senate Report regarding the 1982 amendments to the Voting Rights Act, it was specifically noted that the mere election of a few minority candidates was not sufficient to bar a finding of voting dilution under the results test.[1]

■ Under the totality of the circumstances results test adopted by the Congress, the court below failed to mention any of the evidence presented by the plaintiffs that the minority candidates slated by CBG were not true representatives of the minority population in the city of Abilene. The court failed to mention much of the evidence of polarized voting, block voting, effects of past discrimination, and discriminatory intent in maintaining the at-large system. For example, sociologist Dr. Chandler Davidson testified regarding studies he conducted which indicated some 14 instances of what he considered to be polarized voting in Abilene area elections from 1956 through 1981. Record, vol. 6 at 510–35. Dr. Chandler also stated his opinion that Abilene's adoption in 1962 of the majority-vote requirement was partially motivated by a desire to dilute the votes of Blacks and Mexican-Americans. *Id.* at 593–94. Plaintiff Ben Aguirre testified that he and his family

---

1. "The fact that no members of a minority group have been elected to office over an extended period of time is probative. However, the election of a few minority candidates does not 'necessarily foreclose the possibility of dilution of the black vote', in violation of this section. *Zimmer* 485 F.2d at 1307. If it did, the possibility exists that the majority citizens might evade the section e.g., by manipulating the election of a 'safe' minority candidate.

'Were we to hold that a minority candidate's success at the polls is conclusive proof of a minority group's access to the political process, we would merely be inviting attempts to circumvent the Constitution ... Instead we shall continue to require an independent consideration of the record.' *Ibid.*" S.Rep. No. 417, 97th Cong., 2d Sess., *reprinted in* 1982 U.S.Code Cong. & Ad.News 177, 207.

suffered continuous threats and abuses during and after his wife, plaintiff Amelia Aguirre, sought election to the Abilene City Council, Record, vol. 5 at 360–67; plaintiff Velasquez offered evidence that she encountered hostility and uncooperation from the County Clerk's office in Abilene when she attempted to file as a candidate for Justice of the Peace in 1976 and for County Clerk in 1978. *Id.* at 376–80. This evidence, certainly relevant and substantial in light of the factors to be considered by the court, went without mention by the trial court.

The court below did support its conclusions, but did not indicate whether he had considered certain of plaintiffs' evidence or whether he simply did not consider it persuasive. Without the additional findings of fact called for on remand, there is no way for this court to tell whether the court's determination that there is no effect of discrimination which would violate the Voting Rights Act is clearly erroneous.

We do not intimate what the final result should be, but as for an alleged violation of the Voting Rights Act, as amended in 1982, we should not write until the court below shows that it considered all of the evidence by discussing the same in full.

■ Defendants argue that the new amendments to the Voting Rights Act do not eliminate an intent requirement but instead merely eliminate a need to find direct evidence of discriminatory intent. This argument is absolutely without merit. The Senate Report makes clear the amendments were meant to reinstate a results test.

■ The factors laid out in the Senate Report for showing a violation of the results test are essentially the same factors as in *Zimmer.* Further, as in cases under the Fourteenth and Fifteenth Amendments, a trial judge is to make his ultimate ruling after examination of the "totality of circumstances." While the resolution of each individual *Zimmer* factor might not be different under constitutional and statutory voting dilution claims, it is much easier for

plaintiffs to prove a dilution of the votes of minorities under the totality of the circumstances results test, especially by a showing of their lack of access to the political process. It is much easier to find a single effect than to find a discriminatory purpose behind that effect.

The court below correctly noted that proof of intent is not required under the statutory claim of the plaintiffs-appellants. However, it failed to state that it is easier to prove effects than it is to prove intent. The court below did not detail its findings of voting dilution under the statutory claim of the plaintiffs-appellants, but assumed that its findings on intentional discriminatory purpose would suffice under the Voting Rights Act. Since it is easier under the Voting Rights Act to prove an effect than an intent, the court below did not apply the correct standard in its resolution of the case. It is possible that further findings would make a difference in the final conclusions of the court below.

■ Defendants' cross appeal on the failure to receive attorneys' fees is completely without merit. The accepted rule which allows attorneys fees to be awarded to prevailing defendants where plaintiffs' suit is frivolous, *Christiansburg Garment Company v. E.E.O.C.,* 434 U.S. 412, 421, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978), is a proper rule. The defendants' proposed rule, which would grant attorneys fees if the defendant prevails, would have a chilling effect on suits to redress constitutional violations that would be disastrous. The failure of the court to grant defendants attorneys fees was correct and is affirmed.

AFFIRMED IN PART and REMANDED FOR FURTHER FINDINGS OF FACT AND CONCLUSIONS OF LAW IN ACCORDANCE WITH THIS OPINION.

PATRICK E. HIGGINBOTHAM, Circuit Judge, concurring:

I write separately not to suggest any inadequacy in the majority opinion but to add a parenthetical thought not essential to its holding. In candor, we are yet to give the district courts adequate guidance in the

application of the amended Voting Rights Act, for we have not yet fully defined "discrimination" as the term is used in voting rights cases. For example, the tension between an impact-based test of lawfulness and a rejection of a right to proportional representation defies easy resolution. Constitutional limitations on the congressional enforcement power are in turn left ambiguous by this blurring of the definitional content of prohibited "discrimination." It is then somewhat unseemly to remand in the name of "error" for more detailed factual determinations. Without a measure of relevance, the resolution of factual disputes suffers the weakness of being largely airborne.

Furthermore, I fear the idea that each genre of cases carries its own Rule 52-rooted requirement of specificity. Particularly, I fear that this idea may take hold and grow as an independent appellate principle. Despite these concerns, I agree that this case should be remanded, because our efforts to develop the meaning and constitutional limits of the Voting Rights Act with its 1982 amendment will be here aided by the greater detail. In sum, this remand is impelled more by our own struggle than by any "error" of the district court as that word is usually used.