**WESTWEGO CITIZENS FOR BETTER GOVERNMENT, et al., Plaintiffs–Appellants,**

v.

**CITY OF WESTWEGO, A Municipal Corporation organized pursuant to the laws of the State of Louisiana, et al., Defendants–Appellees.**

No. 87–3761.

United States Court of Appeals, Fifth Circuit.

May 8, 1989.

M. David Gelfand, Terry E. Allbritton, Alice M. Jacobs, Jacobs, Jernigan & Weiner, and Ronald L. Wilson, New Orleans, La., for plaintiffs-appellants.

Jon A. Gegenheimer, Gretna, La., Gerald Arceneaux, Westwego, La., for defendants-appellees.

Laughlin McDonald, Neil Bradley, William P. Quigley, Gen. Counsel, A.C.L.U., for amicus curiae A.C.L.U.

Pamela S. Karlan, Julius Levonne Chambers, C. Lanie Guinier, N.A.A.C.P. Legal Defense and Ed. Fund, for amicus curiae N.A.A.C.P.

Before THORNBERRY, KING and JONES, Circuit Judges.

KING, Circuit Judge:

Plaintiffs-appellants Westwego Citizens for Better Government appeal from the judgment of the district court dismissing their class-action suit under section 2 et seq. of the Voting Rights Act. For the reasons set forth below, we vacate the judgment of the district court and remand this case for specific findings of fact and conclusions of law.

## I.

Westwego is a small city located in Jefferson Parish, Louisiana with a population of 12,663 persons of whom 1,466—or 11.6%—are black. Pursuant to Louisiana's Lawrason Act, Westwego is governed by a mayor and Board of Aldermen. La.Rev. Stat.Ann. § 33:321 et seq. (West 1988). The five aldermen are elected on an at-large basis and also serve as coordinators of five city departments. While there is no prohibition of "bullet" or "single-shot" voting, there is a majority vote requirement. It is apparently undisputed that no black candidate has ever run for the Board of Aldermen.

Plaintiffs[1] filed suit on November 20, 1985 alleging that Westwego's system of electing aldermen on an at-large basis results in the denial or abridgement of black citizens' rights to participate in the political process and to elect candidates of their choice in violation of section 2 of the Voting Rights Act of 1965 (the "Act"), as amended. Plaintiffs sought to demonstrate, through analyses of recent state and local elections, that the voting patterns of Westwego's voters are so racially polarized that a black candidate could not be elected under the present electoral system. Plaintiffs also sought to demonstrate that Louisiana and Jefferson Parish in particular have a long history of racial discrimination which includes segregation and the imposition of significant barriers to black citizens' right to vote, that the residential areas of the City are still segregated by race, and that there continues to be a significant disparity in the socioeconomic status of black and white residents of the City. Plaintiffs also sought to show that the present city government is not responsive to the concerns of Westwego's black residents.

As a remedy for the allegedly unlawful dilution of minority votes, plaintiffs proposed two districting plans for Westwego —one which would retain the present five-

---

**1.** Plaintiffs-appellants are Westwego Citizens for Better Government, an unincorporated association "concerned with the civil rights of black residents of Westwego, Louisiana" and six indi-vidual black citizens who filed a class action complaint for declaratory and injunctive relief "on behalf of all present and future black voters and candidates in the City of Westwego."

member Board of Aldermen and one which would expand the number of aldermen to six. Both plans would create one district in which black residents would comprise a majority (52.9% under the five-aldermen plan and 59% under the six-aldermen plan).

The trial was initially postponed, pending the Supreme Court's decision in *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986)—the Court's first case involving the 1982 amendments to section 2 of the Voting Rights Act. The Supreme Court issued its decision on June 30, 1986. At the conclusion of a two-day bench trial, the district judge dismissed the case, for reasons stated orally at the close of evidence. Appellants filed a timely notice of appeal, asserting that the district court erred in dismissing the case.

## II.

In order to review the district court's judgment, it is essential that we have before us findings of fact and conclusions of law which adequately reflect the bases of the district court's decision. Before we can consider appellants' other claims of error in the district court's decision, we must therefore decide whether we have in this case a sufficient foundation for appellate review.

### A. *Adequacy of District Court's Findings*

■ The district court's factual findings regarding section 2 claims and the ultimate determination of whether vote dilution has occurred are ordinarily subject to the clearly erroneous standard of review. Fed.R. Civ.P. 52(a); *Gingles,* 478 U.S. at 79, 106 S.Ct. at 2781; *Citizens for a Better Gretna v. City of Gretna,* 834 F.2d 496, 498 & n. 4 (5th Cir.1987). However, Rule 52(a) also requires that such findings "provide a sufficiently definite predicate for proper appellate review." *Curtis v. Commissioner,* 623 F.2d 1047, 1051 (5th Cir.1980) (quoting *Hydrospace–Challenger, Inc. v. Tra-*

*cor/MAS, Inc.,* 520 F.2d 1030, 1034 (5th Cir.1975)). We have stressed repeatedly the special need for detailed findings of fact in vote dilution cases:

> Because the resolution of a voting dilution claim requires close analysis of unusually complex factual patterns, and because the decision of such a case has the potential for serious interference with state functions, we have strictly adhered to the rule 52(a) requirements in voting dilution cases and have required district courts to explain with particularity their reasoning and the subsidiary factual conclusions underlying their reasoning.... Perhaps in no other area of the law is as much specificity in reasoning and fact finding required, as shown by our frequent remands of voting dilution cases to district courts.

*Velasquez v. City of Abilene,* 725 F.2d 1017, 1020 (5th Cir.1984) (quoting *Cross v. Baxter,* 604 F.2d 875, 879 (5th Cir.1979), *vacated on other grounds,* 704 F.2d 143 (5th Cir.1983)).

In *Velasquez,* we found it necessary to remand the case to the district court for further findings because, despite an otherwise long and detailed opinion, the court failed "to take note of substantial contrary evidence." *Id.* at 1021.[2]

In the instant case, the district court dismissed the case without providing written findings of fact or conclusions of law. While Rule 52(a) provides that "[i]t will be sufficient if the findings of fact and conclusions of law are stated orally and recorded in open court following the close of the evidence," the findings must still be sufficiently specific to provide a basis for the judgment and for meaningful appellate review of the decision.

The district court's findings in this case are manifestly inadequate. The district court not only failed "to take note of substantial contrary evidence" as in *Velasquez,* it also failed to specify on which

---

**2.** The district court had initially evaluated the City of Abilene's at-large system under the discriminatory intent standard which applied prior to Congress' 1982 amendments which adopted a "results" test for voting dilution claims. We

made clear, however, that the same degree of specificity was required under the results test as under the discriminatory purpose standard. *Velasquez,* 725 F.2d at 1021.

evidence it relied in *support* of its conclusions. The district court's findings are stated in a conclusory fashion, with virtually no reference to the evidence presented at trial. While the district court may in fact have evaluated the evidence critically, the court's assessment of the evidence cannot be discerned from the record before us: "[W]e are unable to determine from a silent record the thought processes of the court below." *Velasquez,* 725 F.2d at 1021.

Because we find that the district court failed to explain its reasoning with sufficient particularity, we must remand this case to the district court so that it may make the specific findings of fact and conclusions of law necessary to support a judgment.

## B. *Errors of Law*

While we cannot render any decision on the merits of appellants' voting dilution claim, we will address the errors of law which the district court is alleged to have made in order to provide guidance for the proceedings on remand.

Section 2 of the Voting Rights Act, as amended,[3] is codified at 42 U.S.C. § 1973 and provides as follows:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.
>
> (b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

The question which the trial court must answer in a section 2 case "is whether 'as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice.' " *Gingles,* 478 U.S. at 44, 106 S.Ct. at 2763 (quoting Senate Report).

It has been widely recognized that "multimember district and at-large voting schemes may operate to minimize or cancel out the voting strength of racial minorities in the voting population." *Id.* at 47, 106 S.Ct. at 2765. Such schemes are not, however, per se violations of section 2. *Id.* at 46, 106 S.Ct. at 2764. Rather, the determination whether an at-large election system such as Westwego's violates section 2 " 'depends upon a searching practical evaluation of the past and present reality' ... and on a 'functional view of the political process.' " *Id.* at 45, 106 S.Ct. at 2763.

The Senate Report enumerates several factors that generally are relevant to the evaluation of section 2 claims:

Typical factors include:

---

3. Congress amended section 2 of the Act in 1982, largely in response to the plurality opinion of the Supreme Court in *Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), which held, in part, that in order to establish a violation of section 2 of the Act, plaintiffs had to prove that the challenged electoral scheme was intentionally adopted or maintained by state officials for a discriminatory purpose. The 1982 amendments revised section 2 to make clear that a showing of discriminatory effects alone would be sufficient to establish a violation of section 2. The legislative history of the 1982 amendments is discussed in detail in *Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), *Citizens for a Better Gretna v. City of Gretna,* 834 F.2d 496 (5th Cir.1987), and *Jones v. Lubbock,* 727 F.2d 364 (5th Cir.1984).

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedures is tenuous.

S.Rep. No. 417, 97th Cong., 2d Sess. 28–29 (1982), *reprinted in* 1982 U.S.Code Cong. & Admin.News 177, 206–07.

In *Gingles,* the Supreme Court clarified that "[w]hile many or all of the factors listed in the Senate Report may be relevant" to a vote dilution challenge to an at-large electoral system, "the use of multi-member districts generally will not impede the ability of minority voters to elect representatives of their choice," unless "a bloc voting majority [would] *usually* be able to defeat candidates supported by a politically cohesive, geographically insular minority group." 478 U.S. at 48–49, 106 S.Ct. at 2765–2766; *Campos v. City of Baytown,* 840 F.2d 1240, 1243 (5th Cir.1988). Under *Gingles,* plaintiffs must establish first, that the group is sufficiently large and geographically compact to constitute a majority in a single-member district;[4] second, that it is politically cohesive; and third,

**4.** The district court found, based on plaintiffs' proposed districting plans, that the black residents of Westwego were a sufficiently large and compact group to constitute a majority in a single-member district. Because one of plaintiffs' proposed plans would not require any increase in the number of aldermen, we do not need to address here the situation in which this threshold showing could be made only by positing an increase in the size of the elected body which would, hypothetically, allow the creation of districts small enough for the minority group to constitute a majority in one district.

If, upon evaluation of the evidence on remand, the district court specifically finds that appellants' evidence establishes that Westwego's black residents could constitute a majority in a single-member district without increasing the number of aldermen, then the propriety of such an increase need not be considered unless this case reaches the remedy stage of litigation.

We note, however, that at oral argument a question was raised as to whether there would in fact be a black majority *of voting age* in a single district under the five-aldermen plan. We have noted that such evidence may be "critical" to a vote dilution claim. *See Houston v. Haley,* 869 F.2d 807, 808 (5th Cir.1989) (on rehearing). Because the record is unclear on this point, we direct the district court to make this determination on remand. If it appears that no single district with a black majority of voting age could be created without increasing the number of aldermen, the district court will have to address the question of whether this situation would defeat plaintiffs' threshold showing or simply affect the remedy to which plaintiffs would be entitled if a violation of section 2 is found. *See East Jefferson Coalition For Leadership & Development v. Jefferson Parish,* 691 F.Supp. 991, 1005–08 (E.D.La.1988) (goes to remedy only).

that the white majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate. 478 U.S. at 50–51, 106 S.Ct. at 2766–67; *Campos,* 840 F.2d at 1243. The second and third elements are usually established by statistical evidence of racially polarized voting by the voters in the relevant political unit. *Id.* The final determination, however, must be made by an evaluation of the "totality of the circumstances," including the factors listed in the Senate Report. *See Citizens For a Better Gretna,* 834 F.2d at 498–99 (noting that Senate Report substantially follows factors set forth in *Zimmer v. McKeithen,* 485 F.2d 1297 (5th Cir.1973) (en banc), so that analysis under *Zimmer* was not sufficiently different as to require remand in light of *Gingles*); *Campos,* 840 F.2d at 1249.

Appellants assert that the district court misapplied the governing law in several critical respects. Specifically, they argue (1) that the district court improperly held that a greater showing of discriminatory results is required in voting dilution cases involving the electoral systems of small city governments as opposed to larger political bodies; (2) that the court improperly refused to consider evidence of bloc voting derived from elections other than aldermanic elections; (3) that the court improperly considered factors which are irrelevant to the determination of a section 2 violation; and (4) that the court generally failed to apply properly the Act's "totality of the circumstances" test.

We address each of appellants' claims in turn.

1. *Applicability of the Voting Rights Act to Local Elections.*

 Appellants object that the district court erroneously held that small municipal governments are subject to less stringent standards under Section 2 of the Voting Rights Act than are larger political subdivisions. The following comments by the district court are the source of appellants' concern:

I also want to say for the record that while I can't cite a case after *Thornburg*

that makes the point that I'm about to make, I'm satisfied that it is true, or ought to be true, the law surely should be different in the case of a multi, many member body, such as a legislature, which is compelled to reapportion after every census. A court's view of what a legislature does in that reapportionment situation, vis a vis single member districts, ought to be more jaundiced than what it is, and what a court's view ought to be when the suggestion is made to the court that it ought to alter a historical, ancient system of electing all of the governing body at-large in a small municipality.

To say it another way, what the court is looking at in *Thornburg* is a reapportionment plan. It is looking at districts which could just as readily be single member as multi member, so, it is looking at it microscopically and saying to the reapportionment planners, to the legislature there, "You can do as readily with a single member district as you can with a multi member. You have many single member districts; why don't you make this one a multi member where you can accommodate to a black potential election, or election of a black candidate by doing that?"

That contrasts vividly with the situation where a court is asked, as I'm asked to do, to tell a municipality that it must alter its age old method of elections in order to accommodate a very small percentage of the population, roughly 11 percent, a low 10 percent of the registration.

And while I say again that I have no case post-*Thornburg* which makes the distinction, the distinction to me, from a political and a broad sense view point, is quite clear. There ought to be a much greater showing, in my judgment, in a situation where a local governing body is subjected to a court order to change its method of voting as opposed to a situation where a legislature has multi member and single member districts, and the suggestion to the Court is that there ought to be more single member dis-

tricts, the result of which would be to elect more blacks.

While it is not clear whether the district court in fact applied a different standard of proof for small city governments, the court does imply that the *Gingles* decision, which involved the reapportionment of state legislative districts, does not apply with equal force to at-large municipal elections.

There is absolutely no authority for this proposition. Congress clearly contemplated that city governments would be subject to Section 2 and created no exception for small political subdivisions.[5] Indeed, we have decided numerous vote dilution claims under section 2, involving the at-large electoral systems of municipalities of varying sizes, without any suggestion that these political subdivisions are subject to a less stringent standard than larger political subdivisions. *See, e.g., Campos,* 840 F.2d 1240 (at-large system of electing city council members violated section 2); *Citizens for a Better Gretna,* 834 F.2d 496 (city's at-large system of electing aldermen violated section 2); *Velasquez,* 725 F.2d 1017 (remanding to district court for further findings regarding section 2 challenge to at-large method of electing city council members); *Jones v. City of Lubbock,* 727 F.2d 364 (5th Cir.1984) (at-large system of electing city council members violated section 2). Any doubt regarding the applicability of the *Gingles* decision to this case is in any event eliminated by our recent applications of *Gingles* to aldermanic elections in Westwego's neighboring town of Gretna,

*Citizens for a Better Gretna,* 834 F.2d at 498–504, and to city council elections in the City of Baytown, Texas. *Campos,* 840 F.2d at 1242–50.

To the extent, therefore, that the district court believed that a less stringent standard applies to the electoral systems of small municipalities, that view is erroneous. The district court should be guided on remand by our decisions in *Citizens for a Better Gretna* and *Overton v. City of Austin,* 871 F.2d 529 (5th Cir.1989).

2. *Evidence Demonstrating Racial Bloc Voting.*

■ Appellants argue further that the district court erroneously declined to consider evidence of racial bloc voting derived from elections other than the aldermanic elections.[6] Evidence of racially polarized voting "is the linchpin of a section 2 vote dilution claim," *Citizens For a Better Gretna,* 834 F.2d at 499, and is relevant to establishing two of the three elements set forth in the *Gingles* decision—the political cohesiveness of the minority group and the ability of the white majority usually to defeat the minority's preferred candidate. *Gingles,* 478 U.S. at 56, 106 S.Ct. at 2770; *Campos,* 840 F.2d at 1244.

Again, although the basis of the district court's decision is not entirely clear, it does appear that the court relied heavily on the fact that there had never been a black

---

5. The Act itself protects the right of U.S. citizens to vote in "any election by the people in any State, Territory, district, county, city, parish, township, school district, municipality, or other political subdivision." 42 U.S.C. § 1971(a)(1). Recently, in holding that section 2 applies to state judicial elections, we emphasized that Congress clearly intended section 2 of the Act to encompass *all* elections. *Chisom v. Edwards,* 839 F.2d 1056, 1059–64 (5th Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 390, 102 L.Ed.2d 379 (1988).

Moreover, the Senate Report explicitly addressed the impact of the amendment on city at-large electoral systems. While the Report acknowledged concerns that " 'court ordered restructuring' would be the 'likely' outcome under the results test," the Senate Judiciary Committee concluded, as did the House Judiciary Commit-

tee, "that the amendment to section 2 is careful, sound, and necessary, and will not result in wholesale invalidation of electoral structures." S.Rep. No. 417, 97th Cong., 2d Sess. 34–35 (1982), *reprinted in* 1982 U.S.Code Cong. & Admin.News 117, 212–13. The Report does *not* suggest that a different standard should be applied to cities, but rather reflects the view that fair application of section 2 will not be unduly onerous for city governments.

6. Appellants also object to the district court's refusal to consider polling data as a supplement to election statistics. Because we remand this case for more specific findings of fact and conclusions of law, we cannot decide on this appeal whether the district court erred in not admitting this data. That claim must await the district court's decision on remand.

candidate[7] for the Westwego Board of Aldermen:

I find also significant the fact that no black has ever run for alderman. I hear the argument that they don't run because they can't win, and I'm not immune to that; I understand it. But, on the other hand, it's a significant fact that any court must face when the suggestion is made "Well, no black can ever win," when we don't have the history or any evidence of any black ever having run.

And I tell you again that nobody, no political scientist, not you, any lawyer here, nor I can predict the political consequences in Westwego of a black running: Where the alignments may be, how white voters might react to it, how black voters might react to it. And elections for aldermen centered in the city itself are essentially different, local in character, from elections that overlap the city boundaries.

Many white voters might well see, as they did in New Orleans, with an electorate twelve years ago, give or take, which was certainly less than 50 percent black electing a black mayor. Numbers of white people saw the importance of having a black mayor, putting aside prejudices that they were born with, and it was inbred, unfortunately.

I simply can't see that the Voting Rights Act would make 90 percent of the citizens in this city who are satisfied with their form of government change it drastically at the suggestion of a group out of the 10 percent who say they don't run because they can't win, but who never have run.

To the extent that these comments indicate that the district court believed that plaintiffs could not, as a matter of law, make out a vote dilution claim based on evidence of racially polarized voting drawn from elections other than the aldermanic elections themselves, this view is incorrect under both *Gingles* and *Citizens for a Better Gretna*.[8] In the latter case, we explicitly declined to construe *Gingles* so narrowly that "the inability of ... blacks to participate as aldermanic candidates would also function to deprive them of relief under § 2."[9] 834 F.2d at 502–03. Instead, we

---

7. Although a plurality of the Court in *Gingles* found that the race of the candidate is unimportant, we have held that "*Gingles* is properly interpreted to hold that the race of the candidate is in general of less significance than the race of the voter—but only within the context of an election that offers voters the choice of supporting a viable minority candidate." *Citizens For a Better Gretna*, 834 F.2d at 503; *Campos*, 840 F.2d at 1245. Consistent with our holdings in *Campos* and in the *Gretna* case, the discussion above assumes that the evidence most probative of racially polarized voting must be drawn from elections including both black and white candidates.

As we noted in the *Gretna* case, when there are only white candidates to choose from it is "virtually unavoidable that certain white candidates would be supported by a large percentage of ... black voters." 834 F.2d at 502. Evidence of black support for white candidates in an all-white field, however, tells us nothing about the tendency of white bloc voting to defeat black candidates. *Id.* This is precisely why we have held that evidence from other elections may be used to support a vote dilution claim where evidence from the specific electoral system at issue is sparse, *see* discussion in text *supra,* and why the district court must consider carefully the relative probative value of each type of evidence.

8. To the extent that the City relies on *Carrollton Branch of NAACP v. Stallings*, 829 F.2d 1547 (11th Cir.1987) for the proposition that evidence from exogenous elections is irrelevant, its reliance is misplaced. In the *Carrollton* case, the Eleventh Circuit stated that "reliance on other elections here is clearly misplaced." *Id.* at 1558. However, the court was referring to the district court's ruling that the plaintiffs' evidence was lacking because it did *not* include data from exogenous elections.

The Eleventh Circuit's conclusion that evidence from "other elections" was not relevant rests upon a fact-specific assessment of the relevance of particular elections—both city and statewide—to a case against the county. *Carrollton* does not stand for the proposition that plaintiffs may never rely on data from "exogenous" elections. Rather, it stands for the proposition that plaintiffs' evidence is not necessarily insufficient because it *excludes* such data where the data are, for specific reasons, of limited probative value. *Carrollton* is therefore entirely consistent with our holding that evidence from other elections should not be deemed irrelevant *per se* to plaintiffs' claims, but must be evaluated according to its particular probative value.

9. While the district court seems to reject the argument that black candidates "don't run because they can't win" as a basis for considering

found that *Gingles* "suggests flexibility in the face of sparse data." *Id.* at 502. In the *Gretna* case, data was available for only two aldermanic elections in which a black candidate had run. We noted that the Supreme Court addressed this situation in *Gingles*, stating that "where a minority group has begun to sponsor candidates just recently, the fact that statistics from only one or a few elections are available for examination does not foreclose a vote dilution claim." *Id.* (quoting *Gingles*, 478 U.S. at 57 n. 25, 106 S.Ct. at 2770 n. 25). Accordingly, we held that the district court had properly considered additional evidence of racial bloc voting, derived from the voting patterns of Gretna precincts in "exogenous" elections [10]—the 1984 presidential primary and state elections.

In the instant case, there are no statistics available for a Westwego aldermanic election involving a black candidate because there have been no black candidates. The Supreme Court, however, also contemplated that "[w]here a minority group has never been able to sponsor a candidate," plaintiffs could rely on other evidence to prove unequal access to the electoral process.[11] *Gingles*, 478 U.S. at 57 n. 25, 106 S.Ct. at 2770 n. 25. While we noted in the *Gretna* case that "exogenous elections alone could not prove racially polarized voting in Gretna's aldermanic elections," 834 F.2d at 502, we also held that the data from

nonaldermanic elections introduced in the *Gretna* case qualified "as a local appraisal because they reflect local voting patterns." *Id.* at 503. We read the second statement as a qualification of the first: Rather than implying that plaintiffs may never make out a vote dilution claim when there is no evidence from "indigenous" elections, the *Gretna* case properly focuses the inquiry on the probative value of the proferred evidence as an indicator of the voting behavior of the relevant polity.

Plaintiffs relied in this case not only on evidence drawn from the voting patterns of Westwego precincts in the 1984 presidential primary elections and in state-wide elections, but also on evidence from elections involving black candidates in parish-wide contests. Following our decision in *Citizens for a Better Gretna*, the district court should decide whether this evidence qualifies as a sufficiently "local appraisal" to establish some degree of racial bloc voting by Westwego's voters and should base its ultimate conclusion upon the strength of that evidence, considered in the context of the "totality of the circumstances" test. In other words, plaintiffs may not be denied relief simply because the absence of black candidates has created a sparsity of data on racially polarized voting in purely indigenous elections. Rather, plaintiffs' claims should stand or fall based upon the probative value of the evidence of racial bloc

evidence drawn from nonaldermanic elections, it is precisely this concern that underpins the refusal of this court and of the Supreme Court to preclude vote dilution claims where few or no black candidates have sought offices in the challenged electoral system. To hold otherwise would allow voting rights cases to be defeated at the outset by the very barriers to political participation that Congress has sought to remove. *Cf. McMillan v. Escambia County*, 748 F.2d 1037, 1045 (11th Cir.1984) ("the lack of black candidates is a likely result of a racially discriminatory system").

10. There appears to be some confusion regarding the proper definition of "indigenous" versus "exogenous" elections. We use the terms here to contrast elections which involve only the geographic unit at issue and those that overlap the boundaries of the relevant unit. The distinction is useful even where data from exoge-

nous elections has been broken down by precinct in order to isolate the voting patterns of the residents of a particular geographic area. It is not possible in all cases to break such data down so that it corresponds perfectly to the population whose voting behavior is at issue and it has also been argued that different considerations may affect voting behavior in elections for purely local offices and in elections for state or national office.

11. The Court refers to "other factors" and does not address explicitly the use of data derived from "exogenous" elections. 478 U.S. at 57 n. 25, 106 S.Ct. at 2770 n. 25. However, because this court has read *Gingles* to allow flexibility in the face of sparse data, *Gretna*, 834 F.2d at 502, it follows that plaintiffs should be able to rely on evidence derived from exogenous elections, with the recognition that such evidence must be evaluated according to its probative value.

voting that they *have* adduced,[12] along with the presence or absence of other factors demonstrating a lack of access to the political process.

3. *Factors Irrelevant to the Vote Dilution Claim.*

 Appellants next contend that the district court relied improperly on several factors that are not relevant to the totality of the circumstances test mandated by section 2. Specifically, they point to comments by the district court referring to the absence of any discriminatory purpose behind Westwego's adoption of the at-large method of electing aldermen,[13] several references to the longevity of Westwego's electoral system, and a discussion of the potential costs of changing to a single-member district system.[14]

Again, while it is not clear to what extent the district court in fact relied on these factors, we address the appropriateness of these considerations in order to avoid unnecessary confusion on remand.

First, while the district court did not treat the issue of discriminatory intent as dispositive, we caution that the explicit purpose of the 1982 amendment was to remove the requirement that in order to establish a violation of section 2, plaintiffs must show that the challenged electoral procedure or practice was installed or maintained for a discriminatory purpose. *Gingles*, 478 U.S. at 35, 106 S.Ct. at 2759; *Campos*, 840 F.2d at 1242; *Jones*, 727 F.2d at 378. Congress clearly intended that a violation of section 2 "could be proved by showing discriminatory effect alone." *Gingles*, 478 U.S. at 35, 106 S.Ct. at 2759.

With respect to the district court's references to the longevity of the Westwego system, we simply caution again that the focal point of the district court's inquiry must be whether the electoral system—however long it has been in place—produces discriminatory results.

Finally, the district court observed in closing that because Westwego aldermen also are responsible for administering certain city departments, a change to a single-member district system could require a costly reorganization of the city's administrative structure. We note, with the Eleventh Circuit, that "[n]owhere in the language of Section 2 nor in the legislative history does Congress condition the applicability of Section 2 on the function performed by an elected official." *Dillard v. Crenshaw County*, 831 F.2d 246, 250–51 (11th Cir.1986); *cf. Chisom*, 839 F.2d at 1062. In *Dillard*, the court evaluated a proposed remedy to a prior finding that the

---

**12.** Defendants, for example, raise a number of objections to the statistical validity of plaintiffs' evidence as an indicator of the voting behavior of Westwego residents. While the district court may reject plaintiffs' claims on the ground that their evidence does not, as a statistical matter, establish racial bloc voting with sufficient certainty, *see, e.g., Overton,* 871 F.2d at 540, it may not disregard such evidence altogether on the view that no one can determine how Westwego's white voters would respond to a black candidate until there is one.

The district court does state at one point that "there is evidence of polarization in other elections, testified to by the expert brought by plaintiff, a great deal of which ... I credit." Elsewhere, however, the court states "that there is indeed no evidence of bloc voting in an all black election. That is to say, you don't have any election where the blacks voted cohesively for a candidate."

We urge the district court on remand to explain specifically which evidence it finds credible and which it does not, to provide reasons for its conclusions, and then to evaluate the strength of that evidence, along with other relevant factors, within the framework of the totality of the circumstances test.

**13.** The district court stated: "There is certainly no evidence that this form of government was installed in the city for any purpose of diluting black vote or black activity or black candidacies. Historically, they have all run at-large forever."

**14.** The fourth comment to which appellants object occurred during the course of the trial when the court stated, in response to counsel's observation that there were few registered black voters in the parish: "That's a problem that's inherent in this lawsuit. We didn't do that. Move more in and register more of them to be 18. There's a lot of things you can do." Appellants argue that the district court thus relied improperly on the availability of alternatives to court-ordered redistricting as a basis for rejecting their claims. However, because the district court did not rely on this point in its final decision, it is not necessary for us to address the propriety of this remark.

County's method of electing two county commissioners and the chairperson of the commission on an at-large basis violated section 2. The proposed alternative would have provided for five commissioners elected from single-member districts and one chairperson elected on an at-large basis. In response to objections to the proposal, the County argued that the chairperson had unique administrative duties and that it would disrupt the allocation of legislative and administrative duties to eliminate the single chairperson position, elected on an at-large basis. The court concluded that the disruption in the allocation of duties that would result from a proposed change in the electoral system is not a sufficient ground for maintaining an otherwise flawed system. *Dillard*, 831 F.2d at 252.

The question presented here is clearer than that presented in *Dillard*. We need not address whether these considerations could play a role in the process of crafting an appropriate remedy once a violation of section 2 has been found. We note only that Congress did not contemplate that such considerations would play a role in determining whether there has *been* a violation of section 2. A contrary holding would allow government bodies to defeat voting rights claims simply by attaching administrative duties to elected offices. This would frustrate Congress' aim of eliminating barriers to the political participation of minorities on grounds wholly irrelevant to the determination required by section 2—namely, whether the electoral system at issue in fact denies minorities equal opportunities to participate in the political process and to elect candidates of their choice.

Therefore, the district court should not consider this factor in determining whether Westwego's at-large electoral system violates section 2.

4. *The Totality of the Circumstances Test.*

 Finally, appellants maintain that the district court appears to have erred in its consideration of several elements that are a part of the totality of the circumstances test. Specifically, appellants note that (1) a history of discrimination, not simply present discrimination, is relevant to a finding of vote dilution, (2) that evidence of socioeconomic inequalities between black and white citizens is relevant to establishing a lack of access to the political system, (3) the court must consider electoral practices which may enhance the dilution of minority votes, and (4) the court must evaluate critically the justifications offered for the retention of an at-large system of electing aldermen.

With regard to appellants' first concern, the district court stated:

I have already commented about the history of discrimination, and about the lack of evidence pointing at Westwego specifically, but certainly Westwego is not an island in itself in the history of Louisiana in terms of discrimination. But, I say again I have said before, that for the last 20 years—and certainly, I confidently say for 15—there is no indication that that continues.

To the extent that these comments indicate that the district court judge disregarded historical evidence of discrimination, based upon his belief that there has been no racial discrimination in Westwego or in the State of Louisiana in the past 15 to 20 years, the district court may have misconceived the role of historical evidence of discrimination in a section 2 claim. The concern underpinning section 2 "is that a certain electoral law, practice or structure *interacts with social or historical conditions* to cause an inequality in the opportunity enjoyed by black and white voters to elect their preferred representatives." *Gingles*, 478 U.S. at 47, 106 S.Ct. at 2765 (emphasis added). The first factor listed in the Senate Report is "the extent of any *history* of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process." S.Rep. *supra*, at 28, 1982 U.S.Code Cong. & Admin.News, at 206 (emphasis added) Thus, Congress was concerned not only with present discrimination, but with the vestiges of discrimination which may interact with present political structures to per-

petuate a historical lack of access to the political system. *Gingles*, 478 U.S. at 69, 106 S.Ct. at 2776. While the district court may decide on remand that the historical evidence of discrimination is not significant in the totality of the circumstances, the court must provide a sounder basis for its conclusion than its personal opinion that discrimination has been eradicated in the recent past.

The following comments by the court are the source of appellants' second concern:

Let me see what other factors are discussed in *Thornburg* that I ought to comment on. I notice well that the evidence is clear that one of the factors in the Congressional Record deals with the relative poverty level of the minority versus majority, but I have to say that in the wildest imagination, I don't know how changing the method of an at-large election is going to change somehow the magic of the poverty level, which is a very unfortunate situation. The presence of public housing, done at a time, in perfectly good faith by a governmental agency that did it, contributed, unfortunately, today to maintaining that poverty level.

. . . . .

The extent to which members of a minority group bear evidence, bear the effects of discrimination in education, and employment and health, I certainly have commented on that, and it is an unfortunate fact, in all likelihood, throughout the United States, not just in the South.

Again, it appears that the district court may have misconceived the role of evidence of socioeconomic inequalities in the totality of the circumstances test. The point is not whether changing the at-large electoral system would eliminate such inequalities. Rather, Congress and the courts have recognized that "political participation by minorities tends to be depressed where minority group members suffer effects of prior discrimination such as inferior education, poor employment opportunities, and low incomes." *Gingles*, 478 U.S. at 69, 106 S.Ct. at 2776. Evidence of socioeconomic inequalities therefore "may be probative of

unequal opportunity to participate in the political process and to elect representatives." *Id.* The court may not disregard Congress' policy judgment regarding the relevance of these factors based simply upon a belief that these factors are widespread or may not be remedied by the relief sought by plaintiffs. On remand then, the district court should consider this evidence in the light intended by Congress.

Third, appellants argue that the district court did not adequately consider other aspects of Westwego's electoral system which could enhance the alleged dilution of minority votes. Specifically, the district court stated that:

the majority vote requirements, insofar as I know, is virtually universal in the United States. There aren't many—certainly in Louisiana, historically. I don't know anywhere in Louisiana; certainly it would have to be by majority vote requirement, and if that can be held by the Congress somehow to indicate some vote condition, that mystifies me.

The fact that majority vote requirements may be commonplace does not alter the fact that Congress clearly *did* conclude that such provisions could serve to further dilute the voting strength of minorities. *See id.* at 56, 106 S.Ct. at 2770; *see also Jones*, 727 F.2d at 383 (finding that majority vote requirement further submerges political minorities). Again, we caution that the district court may not eliminate a factor from the totality of the circumstances test simply because the court does not agree with Congress' policy judgment.

Finally, appellants note that the district court did not evaluate the reasons provided by the City for maintaining its at-large electoral system. Congress did note that the tenuousness of the policy underlying such a system may be probative of a violation of section 2. S.Rep., *supra,* at 29, 1982 U.S.Code Cong. & Admin.News, at 207. To the extent then that plaintiffs argue that Westwego's reasons for maintaining its present system of electing aldermen are tenuous, the court should address

those arguments on remand.[15]

### III.

We emphasize in conclusion that we do not express any opinion about the merits of plaintiffs' claims. We may not do so until we have before us a decision of the district court which sets forth with sufficient particularity its factual findings and the reasoning upon which its ultimate conclusion is based. As the basis of the district court's judgment is unclear, we have addressed appellants' allegations of legal error simply to provide guidance to the district court on remand—we cannot determine from this record the extent to which any of the asserted errors may have affected the district court's judgment. Accordingly, the judgment of the district court is VACATED and the case REMANDED for specific findings of fact and conclusions of law consistent with this opinion.

---

**15.** The district court also found that plaintiffs had failed to establish that the Westwego city government was not responsive to the concerns of black residents. While the district court may certainly reach the same conclusion on remand, we again note that the court must rest its conclusion on a specific evaluation of the evidence and that personal, anecdotal observations about general inefficiencies in the delivery of city services do not provide an adequate basis for rejecting plaintiffs' evidence. We also note that a finding that city officials *are* responsive to the concerns of minority residents is not enough, by itself, to defeat a voting dilution claim. *Campos,* 840 F.2d at 1250; *Jones,* 727 F.2d at 381.