**Maxine B. COUSIN, et al.**

v.

**Ned McWHERTER, et al.**

No. CIV–1–90–339.

United States District Court,
E.D. Tennessee,
at Chattanooga.

Jan. 13, 1994.

Myron B. McClary, Chattanooga, TN, Margaret Carey, Wanda Turner–Lee, Greenville, MS, Laughlin McDonald, Neil Bradley, Kathleen L. Wilde, American Civil Liberties Union Foundation, Atlanta, GA, Richard Dinkins, Williams & Dinkins, Nashville, TN, for plaintiffs.

Michael W. Catalano, State of Tenn., Office of the Atty. Gen., Nashville, TN, for defendants McWherter, Tennessee Election Com'n, Burns and Conrad.

T. Maxfield Bahner, Gary David Lander, Michael J. Mahn, Chambliss & Bahner, Chattanooga, TN, for Hamilton County.

### MEMORANDUM OPINION

HULL, District Judge.

Plaintiffs have brought this action alleging violations of Section 2 of the Voting Rights Act, 42 U.S.C. § 1973 and the fifteenth amendment of the United States Constitution. Plaintiffs are black adult residents and voters in Hamilton County, Tennessee.

Plaintiffs instituted this action on August 31, 1990. Plaintiffs allege that Hamilton County's use of at-large elections for judges of the Eleventh Judicial Circuit of Hamilton County, Tennessee, and for the judges of the Court of General Sessions in Hamilton County, has a discriminatory result. The plaintiffs seek both declaratory and injunctive relief.

Plaintiffs Maxine B. Cousin, Lorenzo E. Ervin, Jr., Ezra B. Harris, George A. Key, Sr., Buford McElrath, Bobby Ward, Ella

Bryant, and Johnny D. Holloway are African Americans, and are registered voters of Hamilton County, Tennessee.

Plaintiffs contend that the at-large, circuit-wide method of electing the nine judges of the Eleventh Judicial Circuit of Tennessee and the three judges of the Court of General Sessions of Hamilton County dilutes the voting strength of African–American residents of Hamilton County in violation of Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, and the fifteenth amendment of the Constitution of the United States.

Defendant Ned McWherter is Governor of Tennessee. He has the duty with the Secretary of State and the Attorney General and Reporter of declaring persons receiving the highest number of votes elected as judge or chancellor and furnishing each person elected with a certificate of election. He has the power of appointing persons learned in the law and constitutionally qualified to fill vacancies in the offices of circuit judge, chancellor, and criminal judge. T.C.A. § 17–1–301(a).

Defendant State Election Commission is an agency of the State of Tennessee and has the duty of supervising elections in Tennessee including elections for judges. T.C.A. § 2–11–101, et seq.

Defendant Will Burns is the Coordinator of Elections. He is the chief administrative election officer of the State of Tennessee and has the duty of obtaining and maintaining uniformity in the application, operation, and interpretation of the election laws. He has the duty of supervising the conduct of all elections. T.C.A. § 2–12–202.

Defendant Hamilton County Election Commission has the duty of conducting elections in Hamilton County, including elections for Circuit Court, Criminal Court, and Chancery Court judges of the Eleventh Judicial Circuit in Hamilton County and General Sessions Court judges in Hamilton County. T.C.A. § 2–12–101, et seq.

Defendant Steve Conrad is Registrar-at-Large of Hamilton County and has the duty of conducting elections in Hamilton County, including elections for judges. T.C.A. §§ 2–12–201, et seq.

Pursuant to T.C.A. § 16–2–506(11)(A), the Eleventh Judicial Circuit consists of "nine incumbent trial court judges and the district attorney currently residing in [Hamilton] County [who] shall continue to serve the Eleventh Judicial District in their respective capacities." Pursuant to T.C.A. § 16–2–502 "[e]ach trial judge shall continue to be officially known and designated as either a chancellor, circuit court judge, criminal court judge, or law and equity court judge depending upon the provision to which he or she was elected or appointed prior to June 1, 1984."

In Hamilton County there are four Circuit Court judges, three Criminal Court judges, and two Chancery Court judges of the Eleventh Judicial Circuit, and three General Sessions Court judges. All judges are elected at-large, county-wide to eight-year terms. Tenn. Const. Art. VI, § 4; T.C.A. § 17–1–103; 1941 Tenn.Priv.Acts, ch. 6. There is no district or ward residency requirement and candidates must designate the particular division or court to which they seek election. T.C.A. § 17–1–103; 1984 Tenn.Priv.Acts, ch. 176. Elections of these judges in Hamilton County are partisan.

### ELEMENTS OF A SECTION 2 CLAIM

The nature of a Section 2 violation and the proof required to establish this type of claim is explained in the Senate Report that accompanied the 1982 amendments to the Voting Rights Act. Not only does the Senate Report reject the intent test for Section 2 claims, but it also enumerates "typical factors" to help guide the courts in the application of the "results test" as the relevant legal standard. These "typical factors" are set out in *Thornburg v. Gingles*, 478 U.S. 30, 36–37 (1986), as follows:

1. the extent of any history of official discrimination in the state or political sub-division that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large

election districts, majority vote requirements, antisingle shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

▮ Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group;

whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

▮ The Court finds that five of these seven Senate factors are applicable to this case, and are in fact supported by the following undisputed facts the majority of which have been filed and stipulated by the parties.

### THE EXTENT OF ANY HISTORY OF OFFICIAL DISCRIMINATION IN THE STATE OR POLITICAL SUBDIVISION THAT TOUCHED THE RIGHT OF THE MEMBERS OF THE MINORITY GROUP TO REGISTER, TO VOTE, OR OTHERWISE TO PARTICIPATE IN THE DEMOCRATIC PROCESS

In 1883 the general assembly enacted a new charter for Chattanooga providing for a system of mandatory voter registration by "age and color," requiring proof of payment of the poll tax as a condition for registration, putting the police force under the control of a commission appointed by the governor, and requiring all city aldermen to be elected at-large but with a ward residency requirement for some aldermen. The purpose of the 1883 charter was to eliminate black office holding. *Brown v. Board of Commissioners of Chattanooga, Tenn.,* 722 F.Supp. 380, 386 (E.D.Tenn.1989).

In 1889 the general assembly enacted a series of laws designed to disfranchise blacks. *Brown, supra* at 386. One of these laws was the "Dortch Law," which required the use of a secret, Australian style ballot. The effect of the law was to impose a literacy test for voting, which had a severe impact on illiterate blacks.

The Dortch Law contained a grandfather clause making it possible for anyone who had voted before 1857 (by definition only whites) to receive assistance with their ballot.

Another law enacted in 1889 was the "Myers Law," which imposed a strict requirement of registration, with racial designation, 20 days prior to each election. The act disfranchised many black voters.

The "Lea Law," also enacted in 1889, provided for separate ballot boxes for state and federal elections. The purpose of the law was to remove state elections and the supervision of white voter fraud from federal oversight.

A fourth law reimposed the requirement of proof of payment of the poll tax as a condition for voting, which had been repealed several years earlier.

In 1901 the general assembly passed a law forbidding even private institutions from educating blacks and whites together.

In 1905 there was a race riot in Chattanooga after whites enforced a new "Jim Crow law" by ejecting all the blacks from a city street car.

During this period of time there was a hardening of white attitudes towards blacks. There were lynchings of blacks in the city in 1885, 1893, 1894, 1906 and 1909, and a lynching in the county in 1897. *Brown, supra* at

386. In 1911 the general assembly enacted a new charter for Chattanooga eliminating ward voting and establishing a Board of Commissioners system of municipal government consisting of a mayor and four commissioners elected at-large.

In addition to abolishing district voting, the 1911 statute contained two other provisions aimed directly at blacks. One prohibited any candidate for municipal office from paying the poll tax of an elector. Another made it a crime for any person to agree to perform any service for any candidate in consideration of anything of value. *Brown, supra* at 387.

## THE EXTENT TO WHICH VOTING IN THE ELECTIONS OF THE STATE OR POLITICAL SUBDIVISION IS RACIALLY POLARIZED

According to the 1990 Census, the population of Hamilton County is 285,536 people, of whom 54,477 (19%) are black. The largest concentration of blacks in Hamilton County is in Chattanooga, the county seat. The population of Chattanooga is 152,466, of whom 51,338 (33.7%) are black. Only 3,139 (5.8%) of the county's blacks live outside Chattanooga. As of October, 1989 there were 140,164 registered voters in Hamilton County, 24,824 (17.7%) of whom were black, 97,306 (69.4%) of whom were white, and 18,-034 (12.9%) whose race was unknown. Blacks were 20% and whites were 80% of the 122,130 registered voters whose race was known.

Blacks in Hamilton County are geographically compact in that they would constitute a majority in one or more single member districts. Based upon a four-seat configuration, corresponding to the number of judges for the Circuit Court of the Eleventh Judicial Circuit, blacks would constitute population and voting age population (VAP) majorities in one district, and the total deviation among districts would be less than 10%.

Based upon a three-seat configuration, corresponding to the number of judges for the Criminal Court and Court of General Sessions, blacks would constitute population and VAP majorities in one district, and the total deviation among districts would be less than 10%.

Based upon a two-seat configuration, corresponding to the number of judges for the Chancery Court, blacks would constitute an influence district in one district, and the total deviation among districts would be less than 10%.

Blacks in Hamilton County are politically cohesive in that they tend to vote as a bloc. The political cohesiveness of blacks in Hamilton County is evident from the racial bloc voting analysis performed by the plaintiffs' expert in this case, Dr. Steven Cole. Dr. Cole used ecological regression analysis, as well as homogeneous precinct analysis, which is another method for determining the existence of racial bloc.

Ecological regression analysis produces, among other things, estimates of the percent of whites and blacks voting for white and black candidates in particular elections. Regression analysis requires one preliminarily to compute the percent of population (or registered voters or turnout) of each race in each precinct (the horizontal axis), and the percent of the votes for each candidate in each precinct (the vertical axis) for each election analyzed. This data is used as coordinates to plot points on a graph. A line is then drawn which "best fits" the points on the graph. The place at which the line crosses the left vertical axis of the graph can be interpreted as representing the voting pattern in an average precinct with no blacks, while the point at which the line crosses the right vertical axis can be interpreted as representing the voting pattern in an all-black precinct. The "slope of the regression line, or the vertical amount by which the line moves from the left to the right axis, is a measure of how much difference there is in voting patterns between whites and blacks."

Homogeneous precinct analysis, which looks at precincts predominantly (90% or more) of one race, is intuitively easy to understand. If white candidates get most or all, and black candidates get few or no votes in homogeneous white precincts, that is direct evidence that whites in those precincts are voting along racial lines.

In conducting his homogeneous precinct analysis, Dr. Cole took a conservative approach. He assumed that all the votes for black candidates in homogeneous white precincts came from white voters. Thus, his estimates based upon homogeneous precinct analysis show the *minimum* level of white bloc voting that occurred.

Dr. Cole analyzed elections which included county and state elections and recent Chattanooga city elections. Dr. Cole's analysis shows that in elections where voters were presented with a racial choice, voting was demonstrably polarized.

No blacks have run for the Eleventh Judicial Circuit or the Court of General Sessions. However, blacks have run for city court on four occasions, and once for the Supreme Court of Tennessee. Dr. Cole's analysis of these five judicial contests shows that voting is racially polarized. Blacks voted for black candidates at the average rate of 76%, showing that blacks are politically cohesive in black-white judicial elections. Whites voted for white candidates in judicial elections at the average rate of 80%. Stated differently, the average level of crossover voting by whites was 20%. The level of white crossover voting in judicial elections has been steadily *declining* over time. In the 1969 contest for city judge the black candidate got 30.7% of the white vote. In the 1980 contest for state Supreme Court the black candidate, an incumbent who had been appointed by the governor to fill an unexpired term, got 30.4% of the white vote. In the 1982 contest for city judge the two black candidates got a combined white vote of just 23.5%. In the 1991 contest for city judge the black candidate got only 13% of the white vote.

Based upon the most recent voting patterns the level of racial bloc voting is increasing in Hamilton County making it more difficult than ever for a black to win a county-wide judicial office.

Dr. Cole also analyzed nine county-wide elections from 1966–1990 using either regression analysis (7 elections) or homogeneous precinct analysis (2 elections). Six of the contests were for county offices, *i.e.*, county council, county trustee, public defender, and juvenile court clerk. One of the elections was for the Tennessee Supreme Court, and

two were Democratic presidential preference primaries. The average level of cohesion of black voters in the nine county-wide elections was 75%, and the average level of white crossover voting was 17%.

Dr. Cole examined a total of 26 black-white elections from 1966–1993 using regression analysis. In these elections the average rate of black cohesion was 79%. The average level of white crossover voting was 12%. Dr. Cole's aggregate homogeneous precinct analysis confirmed the results of his regression analysis.

The defendants' expert, Dr. Delbert Taebel, agreed that voting in Hamilton County was racially polarized, and that blacks were politically cohesive. However he also testified that the controlling factor in elections in Hamilton County is party membership rather than race. Dr. Taebel did not consider the 1980 contest for the Tennessee State Supreme Court in his analysis, and in fact this contest disproves this conclusion. In this 1980 election, a black Republican incumbent, Brown, who had been appointed by the governor to fill an unexpired term, got 30.4% of the white vote and 76.8% of the black vote for a total of 42.7% of the vote in Hamilton County. Although historically blacks in Hamilton County have voted for the Democratic candidate, in this 1980 election, blacks left the Democratic candidate and voted for a Republican black candidate, while 69.6% of the white vote went to a white candidate.

In white/white contests a majority of blacks will often vote for the winning white candidate. Although these white candidates are in some sense the choice of black voters, the choice is one which has been a limited choice by the result of various restrictions in the political process.

***THE EXTENT TO WHICH THE STATE OR POLITICAL SUBDIVISION HAS USED UNUSUALLY LARGE ELECTION DISTRICTS, MAJORITY VOTE REQUIREMENTS, ANTISINGLE SHOT PROVISIONS, OR OTHER VOTING PRACTICES OR PROCEDURES THAT MAY ENHANCE THE OPPORTUNITY FOR DISCRIMINATION AGAINST THE MINORITY GROUP***

Prior to 1941, the Chattanooga board of education was elected at-large in the same

manner as the city commission. No blacks were ever elected to the board under the at-large system.

In 1941, a seven member board of education was created with six appointed members, with the seventh member being the commissioner of education. Citizens in the community were dissatisfied with the appointed board and its lack of neighborhood and minority representation, and launched a campaign in the mid–1970s to establish an elected board using single member districts. The campaign culminated in a referendum election held in 1978. Despite the fact that a majority (52%) of whites voted against an elected board from single member districts, a majority of blacks (89%) voted for the referendum and it passed.

Blacks have regularly been elected to the board of education from the majority black districts.

The Hamilton County Quarterly Court, a predecessor to the current county commission, also used single member district elections. In 1972 three blacks (Greene, Tate, and Kennedy) were elected to the Quarterly Court from the majority black Fourth District.

The Hamilton County Council was created in 1941 to assume many of the duties of the preexisting Quarterly Court, and consisted of the county judge and four council members elected at-large. Although blacks ran for the council (Mapp in 1966; Green in 1974; Mapp, Cotton, and Moore in 1978) no blacks were ever elected under the at-large format.

In 1978 the county commission adopted nine single-member districts following a constitutional amendment requiring counties to use district voting. At the ensuing election, two blacks were elected to the commission (Taylor and McDaniel) from the two majority black districts located within the city of Chattanooga. No blacks have ever been elected from the seven majority white commission districts.

Under the at-large system of elections formerly used by the City of Chattanooga only one black had ever been elected to the commission. After the at-large system was invalidated under Section 2 on vote dilution grounds, the city adopted a system of district voting. Under the new system of district elections blacks have regularly been elected to the city council.

## THE EXTENT TO WHICH MEMBERS OF THE MINORITY GROUP IN THE STATE OR POLITICAL SUBDIVISION BEAR THE EFFECTS OF DISCRIMINATION IN SUCH AREAS AS EDUCATION, EMPLOYMENT AND HEALTH, WHICH HINDER THEIR ABILITY TO PARTICIPATE EFFECTIVELY IN THE POLITICAL PROCESS:

Segregation in the schools at all levels was repeatedly affirmed. Jim Crow laws required segregation in railroad passenger cars, and even in coal mines. These laws were challenged but were held to be constitutional. *Murphy v. Western & A.R.R.*, 23 F. 637 (D.Tenn.1885).

The Chattanooga city commission in the conduct of its business regularly enforced the laws and customs of racial segregation, *e.g.*, authorizing the establishment of a "colored" orphanage in 1922.

In 1942 the state supreme court held that qualified blacks could be denied admission to the College of Law of the University of Tennessee.

The Grand Dragon of the Ku Klux Klan noted in 1946 that there was "a strong Chattanooga Klan."

A five-part, 340–page report by the National Urban League in 1947 documented the continuing existence of segregation in Chattanooga and the depressed socioeconomic conditions of blacks. Some of the report's major findings were: housing for blacks was substandard and a majority of blacks were in the lowest income brackets; many black schools were "housed in places that ought to be condemned;" 70% of all working blacks were in the lowest income jobs—service, janitors, porters, and other unskilled categories; 59 of the local labor unions were composed of whites only; most black businesses catered to the needs of blacks that were not met by white establishments, such as barber shops, cleaning establishments, and taxicabs and jitney services; the only city hospital that would admit black doctors for practice was

Carver Hospital for Negroes; no city hospital provided nursing training for blacks; segregated health care for blacks was generally inferior and the professional attention scant or inadequate; Erlanger Hospital operated a "colored section" for blacks located in the old part of the building; blacks were excluded from membership on city boards and agency staff positions; children's homes, nursery centers, and orphanages were operated on a racially segregated basis. A black policeman was suspended from the force in 1948 for arresting a white man in violation of department policy. The city commission ratified the suspension over the protests of city blacks.

In 1951 a federal court invalidated segregation at the University of Tennessee, including the College of Law, on the grounds that there was no other state institution at which the plaintiffs could obtain a legal education.

In another decision in 1952 a federal court held that segregation in the public schools was not *per se* in violation of the fourteenth amendment.

When Shepherd Hills in Ridgeside was developed in 1953, subdivision lots were deeded subject to covenants forbidding sale or rental "to any Negro, mulatto, or other person of color ... [or] to any person of Jewish or Hebrew blood."

The Men's Civic League issued a report in 1954 in which it charged that the wings of Erlanger Hospital to which black patients were assigned were "overrun by vermin" and were "completely unfit for human beings." The hospital administrator acknowledged that the board was aware of the bad conditions.

Musical events at the city auditorium in Chattanooga were customarily segregated on the basis of race. When a black took a seat in the "whites only" section during a dance in 1956, a fight broke out. The manager recommended that the board adopt a policy barring whites from black dances and barring blacks from white dances.

In 1957, after the Southern Coach Lines removed the segregated seating signs from its buses following a Supreme Court ruling that the segregation was unlawful, someone placed a dummy on the Walnut Street bridge on which was written "All NAACP bus riding niggers."

Two dynamite explosions were set off within one week in 1958 at the Phillis Wheatley Branch of the YWCA for Negroes. Hotels, train stations, drinking fountains, and city parks were all racially segregated.

Blacks were not employed in administrative positions in Chattanooga city government until 1962. The first black to be hired at city hall worked in the finance department as a clerk-typist, the lowest classification in the department. The City of Chattanooga did not open all city operated facilities to blacks until 1963. When the City of Chattanooga hired its first black bus driver in the 1960s, whites tried to intimidate him and someone shot at the bus he was driving. The University of Chattanooga was operated on a racially segregated basis until 1965. Erlanger Hospital did not desegregate its facilities until the government threatened to cut off federal funds in 1966. When the hospital's board agreed to sign a certificate of compliance with the Civil Rights Act of 1964, the president of the board resigned in protest. Blacks picketed the Chattanooga city hall in 1975 calling for equality in employment, housing, and treatment.

In 1984 a predominately black organization, Concerned Citizens, was founded to address problems of racism and police brutality in Hamilton County. Concerned Citizens has conducted prayer vigils and circulated leaflets providing information about the alleged victims of police brutality.

Churches and ministerial alliances in Hamilton County are largely segregated.

Blacks in Hamilton County had a higher risk of mortality when compared to whites for 10 of the 15 principal cause of death for 1980.

Public housing in Hamilton County is owned and operated by the Chattanooga Housing Authority (CHA). The CHA was established in 1938 to take advantage of the Housing Act of 1937, and to provide low rent housing to low income residents of the city. Housing projects were planned and constructed by the CHA, and were occupied, on

a racially segregated basis, including College Hill Courts for blacks in 1941, and East Lake Courts for whites in 1940. Boone–Hysinger Homes, occupied in 1953, was exclusively white, while McCallie Homes, Poss Homes, and Emma Wheeler Homes, built in 1953, 1963, and 1964 respectively, were occupied exclusively by blacks.

After the National Urban League cited the CHA for segregation in public housing in 1964, a CHA official said that we "have always been segregated and we have never had any complaints."

Most of the projects administered by the CHA remain racially segregated to the present time: e.g., Emma Wheeler Homes (98% black); Scattered Sites (97% black); Mary Walker (99% black); Maurice Poss Homes (99% black); S.J. McCallie Homes (98% black); and Harriet Tubman (90% black).

Public housing has been opposed by segments of the Hamilton County population at various times and for various reasons. In the 1940's many viewed public housing as "encroaching socialism" and unfair competition with the private sector. More recently, the City of Chattanooga rezoned a parcel of land in the Hickory Valley Road area from multi-family to single family use at the request of local whites who were opposed to the construction of a federally assisted multi-family housing project on the land. The NAACP challenged the city's rezoning decision in federal district court in 1979 as being racially discriminatory. In 1981 the court approved a consent decree in which the city agreed not to interfere with the development and construction of public housing, and to purchase the Hickory Valley Road property and deed it to the developers for construction of multi-family housing units.

Pupils in the city schools were completely segregated on the basis of race. Only black teachers and principals were assigned to the black schools, and only white teachers and principals were assigned to the white schools. The administrative staff of the school system was all white. County teacher associations were segregated.

The district court entered orders in 1962, 1965, 1967, and 1971 providing for desegrega-

tion of city schools by grades and limited busing of some elementary and junior high school students. Some 2,000 whites filed a suit in state court and secured an order enjoining the city from making available any funds for transportation of school students "to achieve a racial balance within the Chattanooga public school system." City officials voted "to comply with that order without appeal." The school board filed a motion seeking "the instructions" of the district court. The mayor and city commissioners were joined as defendants and the district court vacated the order of the state court. Many whites responded to desegregation by leaving the public schools.

During the desegregation of city schools there were racial incidents and confrontations throughout the late 1960s and early 1970s. City police were required to quell one disturbance at Brainerd High in 1970 as whites and blacks caused a near riot.

In 1975 the federal court approved a plan for desegregation of city schools even though Howard High School and Riverside High School were 99% black. According to the court of appeals, resegregation had occurred but it was the result of "a more subtle and lingering malaise of fear and bias in the private sector which persisted after curative action had been taken to eliminate the dual system itself."

The school desegregation litigation was dismissed by the court in 1986 on the basis that the board had implemented a plan ordered by the court, and that any segregation in the city schools was not a result of board action.

In 1988, 22 of the 52 schools in the city system were racially identifiable (90% or more of one race), e.g. Brainerd High School (94% black); Howard High School (99% black); Hixson High School (93% white); Lookout Valley High School (98% white); St. Elmo (95% black); Alton Park (92% black); Donaldson (91% black); Dalewood (94% black); Woodmore (98% black); etc. Approximately one-half of all students attended schools that were 90% or more of one race.

Blacks in Hamilton County, as a result of past and continuing discrimination in edu-

cation, employment, and other areas, have been isolated from the economic and political main stream. They remain a socioeconomically depressed minority with a limited ability to fund and mount political campaigns.

The per capita income of whites in Hamilton County in 1989 was $15,134.00; for blacks it was $7,381.00.

In Hamilton County in 1989, 16.2% of whites and 31.2% of blacks had income below the poverty level. According to the 1990 Census, in Hamilton County 4.8% of whites and 10.9% of blacks were unemployed. According to the 1990 Census, in Hamilton County 69.3% of whites and 40.4% of blacks owned their own homes.

### THE EXTENT TO WHICH MEMBERS OF THE MINORITY GROUP HAVE BEEN ELECTED TO PUBLIC OFFICE IN THE JURISDICTION

No African–American has ever been elected as a Circuit Court, Criminal Court, or Chancery Court judge of the Eleventh Judicial Circuit in Hamilton County or a General Sessions Court judge for Hamilton County.

There are blacks in Hamilton County who have the necessary qualifications to be judges and chancellors of the Circuit Court and the Court of General Sessions, *i.e.*, who are 30 years of age and who are members of the bar. T.C.A. §§ 17–1–101, 17–1–106.

Although blacks won two of the city judicial elections, no black has ever won a majority of the votes in a county-wide judicial contest.

In the 1969 election for city judge, Harris, a black, got 96% of the black vote. His white opponent got 69% of the white vote. Despite the high level of racial bloc voting, Harris won, in part because overall voter turnout was low (20.5% of VAP), and black turnout was exceptionally high (30% for blacks compared to 15% for whites).

In the 1991 city judge election, Williams, a black, got 100% of the black vote, while his white opponent got 87% of the white vote. Black voter turnout was higher than white voter turnout and Williams was elected.

Although blacks ran for the Hamilton County Council (Mapp in 1966; Green in 1974; Mapp, Cotton, and Moore in 1978) no blacks were ever elected under the at-large format. In the 1978 county council election, the three black candidates ran first among black voters and last among white voters. Blacks have run for other county-wide offices as well. Mapp, a black, ran for county trustee in 1968 and was defeated. Mapp ran for county register in 1974 and again was defeated.

In the 1990 county-wide primary for juvenile court clerk, Swafford, a black, got 74% of the black vote. His white opponent got 74% of the white vote and won the election. Swafford ran for the Chattanooga city council in 1993 in a majority black district and was elected, beating the incumbent and getting 56% of the total vote.

After the complaint was filed in this case, Ardena Garth was elected public defender in 1990, the first black ever to be elected to a county-wide office in Hamilton County. The position of public defender was created in Hamilton County in 1989. The job of the public defender is to provide legal representation to indigent persons charged with crimes.

The Governor of Tennessee, defendant McWherter, appointed Ms. Garth as the first public defender of Hamilton County as part of an announced affirmative action plan. Ms. Garth ran as the incumbent in the elections in 1990.

The voting in both Ms. Garth's primary and general elections was racially polarized. In the primary Ms. Garth got 91% of the black vote, while her white opponent got 62% of the white vote. In the general election, Ms. Garth got 100% of the black vote and her opponent got 52% of the white vote.

### SUPPLEMENTAL SENATE FACTORS

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

### WHETHER THERE IS A SIGNIFICANT LACK OF RESPONSIVENESS ON THE PART OF ELECTED OFFICIALS TO THE PARTICULARIZED NEEDS OF THE MEMBERS OF THE MINORITY GROUP.

The Court affirms and adopts the defendants' findings of fact in regard to this factor which are as follows:

The Circuit Court, Chancery Court, Criminal Court and General Sessions Court Judges of Hamilton County are responsive to the particularized needs of members of the black community in Hamilton County inasmuch as these judges are fair and impartial in the disposition of matters before them.

Specifically, there is no proof that any of the present judges have discriminated against any African–Americans who have been involved in the judicial process as plaintiffs, defendants, attorneys, jurors, or witnesses.

There is no proof that the establishment and maintenance of the present judicial system in Hamilton County was in any way a pretext for diluting minority voting rights.

*WHETHER THE POLICY UNDERLYING THE STATE OR POLITICAL SUBDIVISION'S USE OF SUCH VOTING QUALIFICATION, PREREQUISITE TO VOTING, OR STANDARD, PRACTICE OR PROCEDURE IS TENUOUS.*

The State contends that it has a vital interest in the at-large election of the separate circuit court, chancery court, criminal court and general sessions court judges in Hamilton County. The State contends that the method of electing these judges with their jurisdiction being coextensive with the electorate is a strong factor weighing in favor of finding no violation under Section 2 of the Voting Rights Act in this case.

The defendants contend that any of the alternative mechanisms for electing judges in Hamilton County proposed by the plaintiffs would undermine this vital state interest. The State contends that the subdistrict election of judges would destroy the State's interest in ensuring that the electorate and jurisdiction of each judge are coextensive. A limited or cumulative voting scheme would undermine the judicial system by fostering the creation of particular non-geographic constituencies to which judicial candidates would respond.

The Court finds that this policy underlying the practice of county wide election for judges is tenuous if a totality of circumstances test is utilized. Any voter in any number of different situations may be subjected to the jurisdiction of a judge for which they had no opportunity to vote such as a federal judge, or a judge in a another county or another state. Judges routinely respond to litigants from other areas who will not have the opportunity to vote for the judge in an election. There is never a guarantee that jurisdiction and electorate will be coextensive.

The Court notes that as far as at large elections and district elections are concerned, a plurality vote would win in either system. Under either system, a judge would have jurisdiction over the entire county. A presiding judge would be in control of all the judges in the county, and would have the ability to assign or reassign cases in the event of recusal of a judge or for other reasons. If all the judges in the county recused themselves, the Chief Justice of the Tennessee Supreme Court could designate another judge to hear the case, and justice could be done equally under either electoral system. Under either system the responsibility of electing judges of good will and the commitment to do equal justice to all people under the law would rest with the electorate as it should.

Therefore, the Court finds that under the totality of the circumstances, this state interest in at-large elections will not suffice to overcome a violation of Section 2, because of dilution of black voting strength that it produces in Hamilton County, *Houston Lawyers' Assn. v. Atty. Gen.*, 501 U.S. 419, ——, 111 S.Ct. 2376, 2381, 115 L.Ed.2d 379, 387 (1991), and because it is a somewhat nebulous interest at best.

*CONCLUSION*

The Court finds that in regard to the four seat configuration as well as the three seat configuration proposed by the plaintiffs, the plaintiffs have shown that they would have the ability to elect, and that they can meet the threshold requirements of *Gingles*. In addition, the Court finds that even if this were not the case, based upon the presence of five of the seven Senate factors in this cause, the plaintiffs have shown that under a totality of the circumstances the result of the use of a single at-large district in regard to the election of Circuit Court Judges, Crimi-

nal Court Judges, General Sessions Judges, and Chancellors in Hamilton County dilutes the effectiveness of the minority vote. *Armour v. State of Ohio,* 775 F.Supp. 1044 (N.D.Ohio 1991). The Court finds that under the facts of this case the minority plaintiffs have been denied equal access to the political process, *Chisom v. Roemer,* —— U.S. ——, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991), and that the defendants have failed to show a compelling state interest which would justify this Section 2 violation.

Accordingly, it is hereby **ORDERED** that this matter is set for a settlement conference with an attorney appearing for each party as well as an attorney appearing for the judges who filed an *amicus curiae* brief, on Friday, January 21, 1994 at 1:00 P.M. at the federal courthouse in Greeneville, Tennessee. This settlement conference will be held to expedite and hopefully to facilitate a proposed remedy, even though the Tennessee State Legislature will be given an opportunity to devise a plan that remedies this Section 2 violation prior to further action by the Court. Prior to this conference, all parties and real parties of interest should prepare a proposed remedy which would protect the presently sitting judges as well as provide for a smooth transition into a system which does not violate the voting rights act.

Recognizing that although these presently sitting judges were elected pursuant to a system that had been utilized for many years before a Section 2 violation was found, but finding that the plaintiffs have been denied a meaningful opportunity to participate in the electoral process, the Court would suggest such remedies as creating one additional judgeship for the Circuit Court, one for the Criminal Court, and one for the General Sessions Court of Hamilton County. A five seat configuration could then be established for the Circuit Court, and a four seat configuration could be established for the Criminal and Sessions Courts. No sitting judge would be required to stand for election, but elections for the new judgeships could be held in the newly created minority district created by the new seat configurations. Although a two seat configuration needs to be created for the Chancery Court, the Court suggests

that this be done only by the next currently scheduled election and that no special election will be necessary. It is also suggested that the parties read *Clark v. Roemer,* 777 F.Supp. 471, 480–483 (M.D.La.1991), for possible ideas in regard to establishing "ad hoc" or interim judges to be utilized with the plaintiffs' suggested four, three, and two seat configurations.