Maxine B. COUSIN, et al.,
Plaintiffs–Appellees,

v.

Ned R. McWHERTER, Governor of Tennessee, et al., Defendants–Appellants.

No. 94–5220.

United States Court of Appeals,
Sixth Circuit.

Argued June 20, 1994.

Decided Feb. 14, 1995.

569

Richard H. Dinkins, Jr., Williams & Dinkins, Nashville, TN, Myron Bernard McClary, Chattanooga, TN, Margaret Carey, Greenveille, MS, Laughlin McDonald (argued and briefed), American Civil Liberties Union Foundation, Atlanta, GA, for plaintiffs-appellees.

Michael W. Catalano, Deputy Atty. Gen., Nashville, TN (argued and briefed), for defendants-appellants.

Before: KEITH, NORRIS, and BATCHELDER, Circuit Judges.

1. Plaintiffs Maxine B. Cousin, Lorenzo E. Ervin, Jr., Ezra B. Harris, George A. Key, Sr., Buford McElrath, Bobby Ward, Ella Bryant, Annie D. Thomas, Greg Walton, and Johnny W. Holloway are African–Americans and registered voters of Hamilton County, Tennessee.

KEITH, Circuit Judge.

Defendants-Appellants, Ned McWherter, the Governor of Tennessee; the Tennessee State Election Committee; Will Burns, the Coordinator of Elections; the Hamilton County Election Committee; and Steve Conrad, the Registrar–at–Large of Hamilton County ("Defendants"), appeal the judgment of the district court finding Hamilton County's at-large, circuit-wide method of electing judges violated Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973, and the order enjoining the State of Tennessee from conducting further Hamilton County elections under such a system. *See Cousin v. McWherter*, 840 F.Supp. 1210 (E.D.Tenn.1994). For the reasons set forth below, we **VACATE** the district court's judgment and **REMAND** this case for more specific findings of fact and conclusions of law consistent with this opinion.

## I. Statement of the Case

On August 31, 1990, Plaintiffs [1] filed a complaint in the United States District Court for the Eastern District of Tennessee alleging the at-large, circuit-wide method of electing judges in the Eleventh Judicial District of Tennessee resulted in violations of Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973 ("Section 2").[2] Because the issue of whether Section 2 applied to the election of state trial judges was pending before the Supreme Court in *Houston Lawyers' Ass'n v. Attorney General of Texas*, the district court held the matter in abeyance. *See*, 501 U.S. 419, 111 S.Ct. 2376, 115 L.Ed.2d 379 (1991). Subsequently, trial was set for November 8, 1993.

On October 8, 1993, the district court denied Defendants' motion for summary judgment and the case proceeded to trial. In January 1994, the district court issued a Memorandum Opinion finding Tennessee's at-large system of electing judges violated

2. In their original complaint, Plaintiffs also alleged violations of the Thirteenth, Fourteenth, and Fifteenth Amendments of the United States Constitution. The district court made no findings of Constitutional violations.

Section 2 of the Voting Rights Act. Two weeks later, after a settlement conference, the district court issued an order enjoining the State from conducting any further at-large elections and ordered the State to submit an election plan in compliance with the Voting Rights Act.

In the course of its Memorandum Opinion, the district court concluded "[t]he nature of a Section 2 violation and the proof required to establish this type of claim is explained in the Senate Report that accompanied the 1982 amendments to the Voting Rights Act." *Cousin*, 840 F.Supp. at 1212. It then listed the nine factors usually attributed to the Senate Report which are said to assist courts in applying the "results test" embodied in Section 2. The district court found "Blacks in Hamilton County, as a result of past and continuing discrimination in education, employment and other areas, have been isolated from the economic and political mainstream. They remain a socioeconomically depressed minority with a limited ability to fund and mount political campaigns." *Id.* 840 F.Supp. at 1218–19. The district court concluded six of these nine factors were applicable to this case. The district court further discussed the ninth factor—whether the policy underlying the state's method of electing judges is tenuous—and pointed out:

> [t]he State contends that it has a vital interest in the at-large election of the separate circuit court, chancery court, criminal court and general sessions court judges in Hamilton County. The State contends that the method of electing these judges with their jurisdiction being coextensive with the electorate is a strong factor weighing in favor of finding no violation under Section 2 of the Voting Rights Act in this case[,]

*id.* at 1220, but concluded:

> this policy underlying the practice of county wide election for judges is tenuous if a totality of circumstances test is utilized.
> . . . .
> Therefore ... this state interest in at-large elections will not suffice to overcome a violation of Section 2, because of dilution of black voting strength that it produces in Hamilton County, *Houston Lawyers' Assn.*

*v. Atty. Gen.*, 501 U.S. 419, 426–27, 111 S.Ct. 2376, 2380–81, 115 L.Ed.2d 379, 387 (1991), and because it is a somewhat nebulous interest at best.

*Id.*

Defendants filed a timely notice of appeal and a simultaneous motion for stay pending appeal with the district court. After the district court denied the motion for stay, Defendants sought a stay from this Court. This Court granted a stay pending appeal and expedited the case for appeal.

Although the district court opinion adequately sets out the relevant facts, to illustrate the importance of the claims at hand, we must re-examine certain facts to add context to our decision. The Eleventh Judicial Circuit of Tennessee encompasses Hamilton County, Tennessee, and consists of "nine incumbent trial judges and the district attorney currently residing in [Hamilton] County." Tenn.Code.Ann. § 16–2–506(11)(a) (1992). The nine incumbent judges of the Eleventh Judicial Circuit include: 1) the four members of the Circuit Court; 2) the three members of the Criminal Court; and 3) the two members of the Chancery Court. The General Sessions Court, a county court of Hamilton County, consists of three members. The Plaintiffs challenged the use of an at-large, circuit-wide system of electing the nine judges of the Circuit, Criminal and Chancery courts of the Eleventh Judicial District, and the three judges of the Court of General Sessions of Hamilton County.

Hamilton County has a population of 285,536 people of which African–Americans represent 19%. In the city of Chattanooga, African–Americans represent 33.7% of the population—the largest concentration in Hamilton County. In fact, only 5.8% of African–Americans in Hamilton County live outside Chattanooga.

All Tennessee judges are elected at-large and circuit-wide to eight year terms. Tenn. Const. art. VI, § 4; Tenn.Code Ann. § 17–1–103 (1992). No ward or district residency requirements exist and candidates must designate the particular division or court to which they seek election. Although candidates for these judgeships run county-wide,

they do not run in a "pool" from which the top vote-getters are declared winners; instead, they vie for separately designated positions and the person receiving the highest number of votes in each individual contest wins. In Hamilton County, there is no candidate slating process for judicial officers or majority vote requirement for disputed offices. Tenn.Code Ann. § 2–8–110 (1992). Under the present at-large system, no African–American has ever been elected as a Circuit, Criminal, Chancery or General Sessions Court judge in Hamilton County.

Additionally, the Governor may appoint judges to fill vacancies in county judgeships allowing these judges to later run as incumbents. Of the present nine judges of the Eleventh Judicial Circuit, five were appointed to office and a sixth was appointed in 1977. All six ran county-wide in 1982 as incumbents. The Governor, however, has never appointed an African–American to a county-wide judgeship in Hamilton County.[3]

## II. Discussion

On appeal, Defendants contend the district court reversibly erred by:

(1) failing to conduct any *Gingles* pre-condition analysis;

(2) concluding Plaintiffs met the *Gingles* pre-conditions;

(3) misapplying the "totality of the circumstances" test; and

(4) failing to find the State's interest in maintaining the co-extensive electorate and jurisdiction of the courts outweighed any other factors supporting a Section 2 violation.

In response, Plaintiffs argue the district court properly applied *Gingles* and found evidence supporting all three pre-conditions. Plaintiffs assert they established, and the district court correctly found, a Section 2 violation under the "totality of the circumstances." Plaintiffs finally allege the state's

interest in maintaining a link between a judge's county-wide jurisdiction and electoral base does not outweigh the violation in this case.[4]

As discussed below, we find the district court's opinion does not provide a sufficient record from which to discern the bases underlying its decision. Additionally, we find the district court erred by analyzing the weight of a state's interest within the context of tenuous state election policies—one of the factors suggested by the Senate Report for use in approaching the "totality of the circumstances" test. Finally, we hold the district court erred as a matter of law by finding Tennessee's interest in a judiciary with a co-extensive electorate and jurisdiction was "a somewhat nebulous interest at best."

## A. Background

A review of the passage and history of the Voting Rights Act reveals its broad purpose and expansive application. Section 2 of the Voting Rights Act of 1965 was originally viewed as co-extensive with the Fifteenth Amendment's guarantee that no citizen's right to vote shall "be denied or abridged ... on account of race, color, or previous condition of servitude." U.S. Const. amend. XV. During Congressional Hearings prior to the passage of the Act, the Attorney General indicated the Act would reach "every election in which registered voters are permitted to vote." *Voting Rights: Hearing Before Subcomm. No. 5 of the House Judiciary Comm.*, 89th Cong., 1st Sess. 21 (1965). Similarly, the Supreme Court has demanded an expansive interpretation of the Voting Rights Act noting that the purpose of the Act was "to banish the blight of racial discrimination in voting, which has infected the electoral process in parts of our country for nearly a century." *South Carolina v. Katzenbach*, 383 U.S. 301, 308, 86 S.Ct. 803, 808, 15 L.Ed.2d 769 (1966). In a later opinion, Chief

3. The district court sets out, in great length, the long history of the past and present discrimination African–Americans have faced in Hamilton County. See, *Cousin*, 840 F.Supp. 1210.

4. In the alternative, Plaintiffs argue the district court should be affirmed because their proof of a

discriminatory purpose establishes a Section 2 violation. Defendants correctly note that the district court made no findings regarding intentional maintenance of a discriminatory election policy. Because Plaintiffs have not cross-appealed this issue, it is not properly before this court.

Justice Earl Warren described the broad reach of the Act stating:

> The legislative history on the whole supports the view that Congress intended to reach any state enactment which altered the election law of a covered State in even a minor way. For example, § 2 of the Act, as originally drafted, included a prohibition against any "qualification or procedure." During the Senate hearings on the bill, Senator Fong expressed concern that the word "procedure" was not broad enough to cover various practices that might effectively be employed to deny citizens their right to vote. In response, the Attorney General said he had no objection to expanding the language of the section, as the word "procedure" "was intended to be all-inclusive of any kind of practice." Indicative of an intention to give the Act the broadest possible scope, Congress expanded the language in the final version of § 2 to include any "voting qualifications or prerequisite to voting, or standard, practice or procedure." 42 U.S.C. § 1973 (1964 ed., Supp. I).

*Allen v. State Bd. of Elections,* 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969).

In 1982, Congress amended the Voting Rights Act, specifically responding to the Supreme Court's ruling in *City of Mobile v. Bolden* that a plaintiff must show discriminatory intent to prevail on a Fifteenth Amendment claim, and that Section 2 "adds nothing to [a] Fifteenth Amendment claim," and "was intended to have an effect no different from that of the Fifteenth Amendment itself." 446 U.S. 55, 60–61, 100 S.Ct. 1490, 1496, 64 L.Ed.2d 47. The 1982 amendments broadened the Act, overruling the Supreme Court's requirement of discriminatory intent for Section 2 violations and clarifying the standards necessary to prove a Section 2 violation. Within the Senate Report, Congress clearly stated Section 2 "plaintiffs need not prove a discriminatory purpose in order to establish a violation." *See* Senate Report [No. 97–417; U.S. Code Cong. & Ad. News 1982, 177] at 205, *quoted in Chisom v. Roemer,* 501 U.S. 380, 394–96, 111 S.Ct. 2354, 2364, 115 L.Ed.2d 348 (1991). In expanding Section 2, the Senate Judiciary Committee emphasized:

> [I]f an electoral system operates today to exclude blacks or Hispanics from a fair chance to participate, then the matter of what motives were in an official's mind 100 years ago is of the most limited relevance. The standard under the Committee amendment is whether minorities have equal access to the process of electing their representatives.

Senate Report at 214.

Congress apparently intended the 1982 amendments to provide two separate claims for relief and explicitly provided:

> Plaintiffs must *either* prove such intent, or *alternatively,* must show that the challenged system of practice, in the context of all the circumstances in the jurisdiction in question, results in minorities being denied equal access to the political process.

Senate Report at 205 (emphasis added). While maintaining the original goal of eliminating voting discrimination on the basis of race and ethnicity, Congress adopted a results test by replacing the language "[n]o voting qualification ... shall be imposed ... *to deny or abridge the right* ... to vote" with new language stating "[n]o voting qualification ... shall be imposed ... *which results in a denial or abridgement of the right* ... to vote." (emphasis added).[5]

---

**5.** Section 2, as amended, provides:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2), as provided in subsection (b).

(b) A violation of subsection (a) is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section estab-

In adopting a results test as the proper Section 2 inquiry, the Senate Report codified the test enunciated by the Supreme Court in *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973). See Senate Report at 205. Congress also added subsection (b) to Section 2 which requires a "totality of the circumstances" inquiry into whether members of a protected class of citizens have less opportunity than others to participate in the political process. The Senate Report directed such inquiry should include analysis of the following factors, noted in *White* as useful in establishing the existence of unequal access to the political process:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeal; and

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

The Senate Report noted two other factors probative in discerning vote dilution:

i. whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and,

ii. whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

Senate Report at 207.

The Senate Report provides that "[the factors are not exclusive and] there is no requirement that any particular factors be prove[n] or that a majority of them point one way or another." *Id.* Rather, Congress left it for the courts to decide whether, under the "totality of the circumstances," the voting strength of minority voters is "minimized or cancelled out." *Id.* at 207 n. 118. Congress explicitly instructed that in reaching this determination courts must conduct "a searching practical evaluation of the 'past and present reality.'" *Id.* at 208.

In 1986, the Supreme Court clarified the use of the results test. *See Thornburg v. Gingles*, 478 U.S. 30, 46, 106 S.Ct. 2752, 2764, 92 L.Ed.2d 25 (1986). In *Gingles*, the Court emphasized the importance of maintaining a practical perspective when evaluating the effects and lawfulness of a challenged voting practice or procedure. *Id.* Consequently, the Court held that in Section 2 cases, the trial court must determine whether any practice or procedure "interact[s] with social and historical conditions" to deny plaintiffs "an equal opportunity to participate in the political process and to elect candidates of their choice." *Gingles*, 478 U.S. at 44, 106 S.Ct. at 2763 (quoting Senate Report). Although the Court recognized that at-large voting schemes have been found to cancel out or minimize minority voting strength, the Court held that such schemes are not *per se* violations of Section 2. *Id.* at 47, 106 S.Ct. at 2764. Rather, the Court held a determina-

---

lishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973 (emphasis in original).

tion that an at-large system violates Section 2 depends upon "a searching practical evaluation of the past and present reality . . . and on a functional view of the political process." *Id.* at 45, 106 S.Ct. at 2764.

Additionally, in *Gingles,* the Supreme Court set forth three pre-conditions plaintiffs must prove before a trial court may employ the "totality of the circumstances" analysis. Accordingly, plaintiffs must meet the following pre-conditions:

1) the minority group must be sufficiently large and geographically compact to comprise a majority in a single-member district;

2) the minority group must be politically cohesive; and

3) the white majority must vote sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate.

*Gingles,* 478 U.S. at 50–51, 106 S.Ct. at 2766–67.

In 1991, the Supreme Court extended Section 2 to reach state judicial elections. *Chisom v. Roemer,* 501 U.S. 380, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991). In *Chisom,* the Court held the elections of the justices of the Supreme Court of Louisiana were covered by Section 2. In a decision issued the same day as *Chisom,* the Court held Section 2 similarly applies to the election of state trial judges. *See Houston Lawyers' Ass'n,* supra. In *Houston Lawyers',* the Court also re-clarified the proper application of Section 2. Within a discussion of the at-large, county-wide elections of Texas's trial judges, the Court held that the state's interest in maintaining an electoral system for judges that incorporates a link between a trial judge's jurisdiction and the area of residency of his or her voters, is "a legitimate factor to be considered by courts among the 'totality of the circumstances' in determining whether a Section 2 violation has occurred." 501 U.S. at 427, 111 S.Ct. at 2381. The Court stated:

Because [Texas's] interest in maintaining an at-large, district-wide electoral scheme for single member offices is merely one factor to be considered in evaluating the "totality of the circumstances," that inter-

est does not automatically, and in every case, outweigh proof of racial vote dilution. *Id.*

With this background in mind, we examine the lower court's decision.

## B. Standard of Review

█ A district court's factual findings regarding Section 2 violations and the determination of whether vote dilution has occurred are ordinarily reviewed for clear error. Fed. R.Civ.P. 52(a), *cited in Gingles,* 478 U.S. at 79, 106 S.Ct. at 2781 ("we affirm our view that the clearly-erroneous standard is the appropriate standard for appellate review of a finding of vote dilution"). Rule 52(a), however, does not hinder an appellate court's " 'power to correct errors of law, including those that may infect a so-called mixed finding of law and fact, or a finding of fact that is predicated on a misunderstanding of the governing rule of law.' " *Gingles,* 478 U.S. at 79, 106 S.Ct. at 2781, (quoting *Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 501, 104 S.Ct. 1949, 1960, 80 L.Ed.2d 502 (1984)).

## C. The Record is Inadequate for Proper Appellate Review

█ Rule 52(a) requires that a district court's findings "provide a sufficiently definite predicate for proper appellate review." *Westwego Citizens for Better Gov't v. Westwego,* 872 F.2d 1201, 1203 (5th Cir.1989) (citations omitted). We require a particularly definite record for voting rights cases. The Fifth Circuit explained this reasoning in *Velasquez v. City of Abilene,* 725 F.2d 1017, 1020 (5th Cir.1984) (vacating and remanding case to district court where analysis not supported with requisite particularity) (relying on *Cross v. Baxter,* 604 F.2d 875, 879 (5th Cir.1979), *vacated on other grounds,* 704 F.2d 143 (5th Cir.1983)). The panel in *Velasquez* held:

because the resolution of a voting dilution claim requires close analysis of unusually complex factual patterns, and because the decision of such a case has the potential for serious interference with state functions, we have strictly adhered to the Rule 52(a) requirements in voting dilution cases and

have required district courts to explain with particularity their reasoning and the subsidiary factual conclusions underlying their reasoning ... perhaps in no other area of the law is as much specificity in reasoning and fact finding required, as shown by our frequent remands of voting dilution cases to district courts.

*Id.* Based on this standard, as applied below, we must vacate and remand this case.

■ Here, the record fails to provide the bases for the district court's reasoning. The record before us does not establish whether the district court applied the *Gingles* pre-conditions to Plaintiffs' claims. Instead, the court discussed all of the plaintiffs' claims within an over-arching "totality of the circumstances" analysis. The court organized its opinion by the Senate factors and made its "totality of the circumstances" analysis without any discussion of the *Gingles* pre-conditions, without any *Gingles* findings, and without any attempt to apply the *Gingles* pre-conditions mentioning them only in its concluding paragraph.

The court launched directly into its "totality of the circumstances" analysis without any pre-condition findings. Although the Plaintiffs argue we could extract findings supporting each pre-condition from the "totality of the circumstances" findings, we require specificity and clarity for voting rights cases.

■ Within its concluding paragraph, the district court devoted one sentence to the *Gingles* pre-conditions. The court stated:

> [I]n regard to the four seat configuration [for the Circuit Court] as well as the three seat configuration [for the Criminal Court] proposed by the plaintiffs, *the plaintiffs have shown that they would have the ability to elect, and that they can meet the threshold requirements of Gingles.* In addition, the Court finds that even if this were not the case, based upon the presence of five of the seven Senate factors in this cause [sic], the plaintiffs have shown that under a totality of the circumstances the result of the use of a single at-large district in regard to the election of Circuit Court Judges, Criminal Court Judges, General Sessions Judges, and Chancellors

in Hamilton County dilutes the effectiveness of the minority vote. *Armour v. State of Ohio,* 775 F.Supp. 1044 (N.D. Ohio 1991). The Court finds that under the facts of this case the minority plaintiffs have been denied equal access to the political process, *Chisom v. Roemer,* 501 U.S. 380, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991), and that the defendants have failed to show a compelling state interest which would justify this Section 2 violation.

840 F.Supp. at 1220 (emphasis added). The court's conclusory findings, devoid of any analysis, lack the requisite specificity to allow proper review. Furthermore, the district court erred to the extent it appears to have assumed a Section 2 violation can be proven where the three *Gingles* pre-conditions have not been established. On remand, the district court must consider and apply the *Gingles* pre-conditions separately to Plaintiffs' ability to elect and ability to influence claims.

■ The Supreme Court has not explicitly recognized the validity of ability to influence claims; nor do we. Assuming, arguendo, that ability to influence claims exist, a possibility the Supreme Court has not foreclosed, these claims must be analyzed separately from, and differently from claims alleging infringement of a minority's ability to elect. Furthermore, the *Gingles* analysis would need to accommodate the nature of an influence claim. *See, e.g., Voinovich v. Quilter,* —— U.S. ——, ——, 113 S.Ct. 1149, 1157, 122 L.Ed.2d 500 (1993).

Assuming the minority group satisfies the *Gingles* pre-conditions, the court must then determine whether the totality of the circumstances of the local political landscape establishes "its members have less opportunity than other members of the electorate to participate in the political process and elect representatives of their choice." 42 U.S.C. § 1973(b). We make no determination regarding the sufficiency of the district court's "totality of the circumstances" analysis.

**D. The District Court Erred in its Analysis of the State's Interest in Linking the Judiciary's Electorate and Jurisdiction**

■ The district court twice erred in its consideration of Tennessee's interest in

maintaining an at-large, circuit-wide system of electing trial judges. First, we find the district court erred by analyzing the state's interest within the tenuousness factor of the "totality of the circumstances" inquiry. We find a state's interest in preserving an electoral method must be considered and weighed as a separate factor within a totality of the circumstances inquiry.

 Next, we find the district court erred as a matter of law in finding this interest was tenuous and "nebulous at best." As discussed below, we hold, as a matter of law, that Tennessee has a legitimate interest in preserving its at-large system of electing trial judges and that this interest must be weighed as a separate factor within the "totality of the circumstances" analysis in determining whether a Section 2 violation has occurred.

### 1. The District Court Did Not Weigh the State Interest as a Separate Factor Under the Totality of the Circumstances Inquiry

As noted above, in *Houston Lawyers'*, the Supreme Court held a state's interest in linking the jurisdictional and electoral bases of its judges was a legitimate factor to be considered within the totality of the circumstances inquiry. 501 U.S. 419, 426–27, 111 S.Ct. 2376, 2381, 115 L.Ed.2d 379. *Houston Lawyers'* is of particular interest, since the election process for Texas judges scrutinized in that case, was similar to the method utilized in this case by the State of Tennessee.

The Supreme Court specifically held:

Rather we believe that the States' interest in maintaining the link between an electoral system—in this case, Texas' interest in maintaining the link between a district judge's jurisdiction and the area of residence of his or her voters—is a legitimate factor to be considered by courts among the "totality of circumstances" in determining whether a Section 2 violation has occurred.... Because the State's interest in maintaining an at-large, district-wide electoral scheme for single-member offices is merely one factor to be considered in evaluating the "totality of the circum-

stances," that interest does not automatically, and in every case, outweigh proof of racial vote dilution.

*Id.* at 426–27, 111 S.Ct. at 2380–81.

The Supreme Court clearly intended courts weigh this interest as a factor separate from those previously enunciated in the Senate Report. The wording of the Senate Report relied upon by the district court— whether the policy underlying the state's election procedure is "tenuous"—connotes an inquiry into pretext. *See McMillan v. Escambia County*, 748 F.2d 1037, 1045 (11th Cir.1984). But pretext is not the question here, since, in view of *Houston Lawyers'*, the state's interest in linkage is assumed to be legitimate. What is involved is the weight to be accorded this legitimate state interest in the totality of the circumstances, to determine if Section 2 has been violated.

Here, the district court discussed the validity of Tennessee's interest in having judges with an electorate co-extensive with their jurisdiction under the subtitle: *"Whether the Policy Underlying the State or Political Subdivision's Use of Such Voting Qualification, Prerequisite to Voting, or Standard, Practice or Procedure is Tenuous."* 840 F.Supp. at 1219–20. Although previously in its opinion the court found "no proof that the establishment and maintenance of the present judicial system in Hamilton County was in any way a pretext for diluting minority voting rights," the court concluded the policy underlying such system was tenuous. Historically, the probative value of the tenuousness inquiry was its propensity to show whether a state's policy was pre-textual. Thus, the court's conclusions are inconsistent.

We note, however, the Supreme Court has not changed the "results oriented inquiry" required for Section 2 challenges. Although courts must weigh a state's interest as a separate factor, the balancing must occur within a " 'searching practical evaluation of the past and present reality' ... and on a 'functional view of the political process'."

*See Gingles,* 478 U.S. at 45, 106 S.Ct. at 2763–64 (quoting Senate Report).[6]

### 2. The District Court Erred in its Determination of The Weight of Tennessee's Interest

As discussed below, the district court's characterization of Tennessee's interest in a co-extensive electorate and jurisdiction as "nebulous at best," constitutes legal error. The only court of appeals yet to interpret the state interest formula described in *Houston Lawyers'* is the Fifth Circuit, and it did so in the course of considering *Houston Lawyers'* upon remand from the Supreme Court. *See League of United Latin Amer. Citizens v. Clements,* 999 F.2d 831 (5th Cir.1993) (*en banc*), *cert. denied,* —— U.S. ——, 114 S.Ct. 878, 127 L.Ed.2d 74 (1994) (hereinafter *"LU-LAC"*). In *LULAC,* the Fifth Circuit found a substantial interest in judicial effectiveness was served by linking the jurisdictional and electoral bases of the Texas district courts. 999 F.2d at 868. Likening the Section 2 determination to the question of a state's interests in the areas of substantive due process and equal protection, the *LULAC* majority held that the determination of the weight to be given a substantial state interest is a matter of law to be decided *de novo. Id.* at 871. The majority concluded that because this is a substantial state interest, it can be overcome only by evidence that amounts to substantial proof of racial dilution and that, as a matter of law, Texas's interest in linking electoral and jurisdictional bases was substantial and outweighed a finding of vote dilution. *Id.* at 868.

We agree with the Court of Appeals for the Fifth Circuit, to the extent that it concluded Texas had a substantial interest in linking trial judges' electorate to their jurisdiction, and conclude that, because Tennessee has no less legitimate an interest in its method of electing judges, the district court erred as a matter of law when it found Tennessee's interest in electing judges with a jurisdiction co-extensive with their electorate was "nebulous at best." On remand, the district court must weigh this substantial

state interest against evidence bearing on the factors indicative of vote dilution. The state's interest is only one factor to be considered in evaluating the totality of circumstances. It does not automatically outweigh proof of racial vote dilution. However, because the state's interest is a substantial one, the plaintiffs must produce evidence supporting the dilution claim sufficient to carry their burden of outweighing the state's interest.

### III. Conclusion

We must emphasize that we do not express any opinion about the merits of the Plaintiffs' claims. As discussed above, our review is constrained because we lack a record setting forth with sufficient particularity the bases for the district court's reasoning. Because the basis for the district court's finding of vote dilution is unclear and contains an error of law, we can not address the extent to which other errors alleged by the Defendants affected the district court's judgment. On remand, the district court is to determine the presence or absence of the three *Gingles* pre-conditions which plaintiffs must necessarily prove in order to establish their vote dilution claim; and if the court finds those preconditions do exist, to consider the totality of the circumstances in order to determine whether, in the context of all those circumstances, a Section 2 violation has occurred. We therefore **VACATE** the judgment of the district court and **REMAND** the case for specific findings of fact and conclusions of law consistent with this opinion.

---

6. In fact, the Court very recently reaffirmed the need for "totality" review in order to reach the "demonstrated ingenuity of state and local governments in hobbling minority voting power."

*See, Johnson v. De Grandy,* —— U.S. ——, ——, 114 S.Ct. 2647, 2660, 129 L.Ed.2d 775 (1994) (citing *McCain v. Lybrand,* 465 U.S. 236, 104 S.Ct. 1037, 79 L.Ed.2d 271 (1984)).